# GRAND CENTRAL MIN. CO. v. MAMMOTH MIN. CO.

No. 1431.  (83 Pac. 648).

1. Mines and Minerals—Rights of Locators—Presumptions.—The locator of a lode claim is presumed to own all the ore within planes drawn vertically downward to the deep through the boundary lines of such claim, as well as the surface and everything appurtenant to the claim, which presumption continues until some other locator establishes that such deposits belong to another lode having its apex in his ground, so that he is entitled to extralateral rights reserved by Revised Statutes United States, section 2322 [U. S. Comp. St. 1901, p. 1425].

2. Same—Mining Claim—Findings—Apex—Extralateral Rights. Where a person owns a mining claim having an apex of a vein within its limits extending through the claim lengthwise, he has, by virtue of the extralateral rights reserved under the statute, a right to follow the vein, between vertical planes drawn downward through the end lines of the location, from the apex, on the dip, to the deep, although such vein may so far depart from a perpendicular, in its course downward, as to extend outside of the vertical side lines of the surface of the location into ground belonging to the adjoining owner.

3. Same — Vein—Apex and Strike—Ore Bodies—Burden of Proof. Where defendant, who was the owner of a lode claim, claimed ore underlying plaintiff's adjoining claim by virtue of extralateral rights, defendant was bound to show not only that the apex and strike of the vein were within the boundaries of defendant's claim, but that between planes drawn vertically downward through the end line of plaintiff's claim and a certain parallel line the vein from its apex on its dip was continuous, that the continuity extended to and through plaintiff's ground and that the ore bodies claimed formed a part of such vein.

4. SAME—PATENT—MINING CLAIM—PRESUMPTIONS.—A patent to a mining claim raises the conclusive presumption that there is an apex of a vein within the patented ground, but there is no presumption that such vein embraces ore without the side lines of the claim, or that the vein presumed is the one in dispute.

5. APPEAL—MINING SUIT—QUESTION OF APEX—EVIDENCE—CONFLICTING OPINIONS OF WITNESSES—PHYSICAL FACTS—FINDINGS—CONCLUSIVENESS.—Where, in the trial of a mining suit involving the question of apex and location of a vein, there is a substantial conflict in the evidence with reference to the properties in dispute, as to what physical facts exist, as well as in the opinions of witnesses drawn from the facts, the findings relating to the questions of apex, dip, and continuity of the vein, and ownership of the disputed bodies, will not be disturbed by the appellate court, unless they are so manifestly erroneous as to demonstrate some oversight or mistake which affects the substantial rights of the appellant.

6. MINES AND MINERALS—SEDIMENTARY ROCK—VEIN—CRUSHED MATERIAL—MINERALIZATION.—The mere fact that sedimentary rock is broken, crushed, seamed, stained, and fissured does neither constitute such material a vein nor an apex of a vein, where no hanging wall nor foot appears, where the mineralization of such crushed material is not appreciably greater than that existing generally throughout the sedimentary area, and where the same kind of crushed and brecciated material exists elsewhere and generally within that area.

7. APPEAL—EQUITY SUITS—INSTRUCTIONS.—The verdict of a jury in an equity suit on controverted questions of fact submitted to it being merely advisory, error cannot be predicated on instructions given or refused.

8. MINES AND MINERALS—VEIN OR LODE—DEFINITION.—Veins or lodes are lines or aggregations of metal imbedded in quartz or other rock in place, consisting of a strip of mineral-bearing rock within defined boundaries in the general mass of the mountain, which must be continuous and without interruption, bounded by country rock mineralized to no greater extent than the general condition of the vicinity.

9. SAME—VEIN — CONTENTS — MINERAL VALUE.—Rock or matter of any kind, in order to constitute a vein or lode within the meaning of the statute, must be metalliferous and contain such mineral value as will distinguish it from the country rock, especially where no well-defined walls appear.

10. SAME—ESSENTIAL ELEMENTS—EVIDENCE.—Under the acts of Congress the essential elements of a vein are mineral or mineral-bearing rock and boundaries, and, in case of controversy, where one of these elements is well established, very slight evidence may be accepted as to the existence of the other.

11. SAME—EXTRALATERAL RIGHTS.—In order to entitle the owner of a mining claim to extralateral rights, it is not sufficient that the vein he seeks to follow outside the boundaries of his claim consists of rock sufficiently mineralized so that a miner can follow it with a reasonable expectation of finding ore; but it is necessary that there should be a ledge or body of mineral or mineral-bearing rock of such value as will distinguish it from the country rock or from the general mass of the mountain.

12. SAME—MINING CLAIM—LOCATION—DISCOVERY— RESERVED RIGHTS —FEDERAL STATUTES.—What may constitute a sufficient discovery to warrant a location of a mining claim may be wholly inadequate to justify the locator in claiming or exercising rights reserved by the statute.

13. SAME—DISCOVERY—INVASION—POSSESSION— ADJOINING OWNER— PRESUMPTION.—What constitutes a discovery that will validate a location is a very different thing from what constitutes an apex to which attaches the statutory right to invade the possession of and appropriate the property which is presumed to belong to the adjoining owner.

14. SAME— PROSPECTOR— LOCATIONS— POLICY OF LAW— CONFLICTING LODE CLAIMANTS—RULES OF CONSTRUCTION.—It is the object and policy of the law to encourage the prospector and miner in their efforts to discover mineral, and therefore as betweeen conflicting lode claimants, the law is liberally construed in favor of the senior location; but where one claims what, prima facie, belongs to another, because of the apex in the claimant's location, a more rigid rule of construction against the claimant prevails.

15. SAME—FISSURE VEIN—FILLING—VALUES OF—SPECIAL REFERENCE —DISTRICT—LOCATION.—What values the filling or material of a fissure should contain to constitute it a vein, within the meaning of the act of Congress, must necessarily depend upon the characteristics of the district or country in which the vein or lode, in any particular instance claimed to exist, is located and upon the character, as to boundaries, of the vein itself. Values, therefore, of the filling of the vein must be considered with special reference to the district where the vein or lode is found.

16. SAME—VEIN—DEFINITION.—The definition of a vein must be considered with reference to the formations and characteristics of the particular district in which the vein is located.

17. SAME—VEIN—BOUNDARIES—FILLING—VALUES — DIFFERENTIATION —COUNTRY ROCK.—Where the boundaries of what is claimed to to be a vein are not well, or not at all, defined either at the surface or at a depth, the value of the material must be so in excess of the country rock as to differentiate it from such rock; else the material can not be held to constitute a vein.

18. SAME—MINERALIZATION.—In the absence of defined walls and of mineralization appreciably greater than that contained in the general mass of the mountain, broken, strained, and fissured material, or crushed and brecciated matter characteristic of the district, cannot be held to constitute a vein or lode, under the statute.

19. SAME—FRACTURING— LIMITS — VEIN — VUG — COUNTRY ROCK. In such case, the limits of fracturing do not constitute the limits of the vein, and, even if there be found an occasional vug or fragment of ore, yet, where it is disconnected from any ore body and so intermingled with the surrounding country rock that it cannot be regarded as continuous, it does not mark the line of the vein or lode within the meaning of the law.

20. SAME—VEIN — SEDIMENTARY BEDS — REPLACEMENT — MINERALIZATION — ORE BODIES — DEPOSITION OF ORE — LIMITS.—Where a vein, located in sedimentary beds of rock, is formed by replacement, and the mineralization ceases within a short distance of the ore body or ore channel, the limits of the deposition of ore are the limits of the vein, and this is so whether the vein be considered laterally or with reference to the apex.

21. SAME — COURSE — STRIKE — DIP — ORE BODIES.—The course of the vein longitudinally, as it passes through the country, is its strike; and where the dip of the vein is vertical, or practically vertical, the line of its ore bodies may mark the line of its strike.

22. SAME — LOCATION — GEOLOGICAL FEATURES.—In determining the location and strike of a vein, the geological features of the adjacent country, so far as in evidence, will be considered by the court.

23. SAME — MINING SUIT — FINDINGS OF FACT—EVIDENCE.—In a suit to determine extralateral rights appurtenant to a mining claim, evidence *held* to sustain a finding that the vein in question at its apex and on its northwesterly course or strike crossed the western side line of defendant's lot and wholly diverted therefrom at a point 690 feet north of its south end line, and north of that point did not continue, either at its apex or on its strike, to or beyond a certain 1,100-foot line within the limits of defendant's boundaries, and that there was no vein or lode, having an apex or any part thereof within the limits of defendant's claim north of the southerly end line of plaintiff's claim extended easterly in its own directions and south of such 1,000-foot line, which on its dip extended to and included any of the ore bodies existing underneath the surface of plaintiff's claim south of such 1,100-foot line, and that defendant was therefore not entitled to extralateral rights with reference to any ore underlying plaintiff's ground.

24. APPEAL — TRIAL — WRITTEN OPINION — RECORD FINDINGS.—The written opinion of a trial judge, stating the reasons for his action or judgment, is not properly a part of the record, and affords no evidence that the recitals contained are true or are supported by the proof, nor can such opinion qualify or limit the finding or decision.

25. SAME — ASSIGNMENTS OF ERROR — OPINION OF COURT.—The act of a trial judge in delivering an opinion, stating the reasons for his action or judgment, is not an act on which error can be predicated.

26. PLEADING — AMENDMENT THEORY OF JUDGE.—Where, in a suit to determine extralateral rights as appurtenant to a mining claim, defendant through the entire litigation and during two protracted trials continuously based its claim to extralateral rights on the theory that the apex of the vein sought to be followed was within the limits of a certain claim owned by it, and no claim was made that the apex was in certain other adjoining claims until the theory was advanced by the trial judge in an opinion accompanying findings denying defendant's claim, which theory was not sustained by any evidence introduced, defendant was not entitled to amend to conform to the theory of the judge; there being no pretense that any additional evidence could be introduced to sustain the same.

27. PLEADING — AMENDMENT — ADDITIONAL PLEADING — VARIANCE.— When a party litigant offers to file an amendment or an additional pleading at the close of the trial without an offer of further proof, the offer to file may be properly rejected, in the absence of variance between the pleadings and proof.

(Decided October 11, 1905.)

APPEAL from District Court, Fifth District; T. Marioneaux, Judge.

Action by the Grand Central Mining Company against the Mammoth Mining Company. From a judgment in favor of plaintiff, defendant appeals.

AFFIRMED.

*C. S. Zane, John M. Zane, J. W. Stringfellow* and *H. L. Pickett,* for appellant.

*Dickson, Ellis, Ellis & Schulder* and *Brown & Henderson,* for respondent.

APPELLANT'S POINTS.

The errors assigned are: (1) Upon the giving of certain instructions and the refusal of others requested by the appellant; (2) upon the refusal to allow the filing of an amended counterclaim and in entering its decree and in not allowing a new and original counterclaim to be filed; (3) in denying a new trial; (4) insufficiency of evidence specifying the particulars; (5) in not submitting to the jury the location of the apex.

I.

The error assigned in regard to the finding of the court as to the apex, is, when condensed, as follows: The court erred in finding that the apex departed from lot 38 at the Cunningham stope and did not continue to the northward of that point at least partly in lot 38 up to the 1,100-foot line. The question is raised by the 20th, 21st and 22nd assignments of error.

The only confusion that exists in regard to this matter is not really, upon the evidence, a difference upon the facts, but a difference as to the meaning of words and a difference in the opinion of witnesses as to what is an apex, a difference which arises from conclusions of law.

If the finding of the court were based mainly upon conflicting evidence we would not urge so confidently that the finding of the court was in error. But when the evidence is examined it will be found that there is little if any dispute as to the actual physical facts, but it is when the witnesses are talking about such terms as "vein matter," "vein material," "apex," "outcrop" and "vein," which are all terms depending for their meaning upon the preconceived opinions

of the witnesses as to the meaning which the law gives these terms, that we find the actual dispute beginning to arise.

It is said, however, that the definitions of vien and discovery which we have cited in the cases above, are given in controversies between claimants of the same ground, not in cases where the existence and continuity of a vien and extralateral rights are in question. But the statute says no location shall be made of any mining claim until a discovery of a vein therein. (Rev. Stat. U. S. sec. 2330.) The respondent contends that a locator may have a discovery of a vein at the surface, sufficient to fulfill the terms of the statute just mentioned, yet the same discovery will not constitute an apex at the surface. The contention of respondent seems to be a contradiction in terms, and has no support in any adjudicated cases.

## II.

The theory of the appellant was this: That if the vein extends upward above where merchantable ore in it is found, and the fissures are found at the surface, and the indications are such that a miner would follow them, and if they were actually followed down in the vein to ore, such occurrences on the surface constituted the apex of the vein and it was immaterial what the vein matter assayed, whether it was rich or poor. This is based upon an expressed ruling of the Utah Supreme Court. (*Harrington v. Chambers,* 3 Utah 94.) This authority has been followed in the following cases: *Golden Terror v. Mahler,* 4 Morrison Rep. 370; *Burke v. McDonald,* 2 Idaho 640; *Migeon v. Montana Central R. C.,* 77 Fed. 249.)

The latter case points out very clearly the distinctions in regard to this matter, and cites former cases which we do not refer to because they are contained in that case.

## III.

The court when the verdict was returned stated orally that he was inclined to think that the apex was in the Golden King and Bradley claims belonging to the appellant.

Thereupon the appellant gave notice that if such was the holding it desired to amend, so that its claim of apex in the Golden King and Bradley, would not be cut off.

The court thereupon stated that this right to amend was a valuable right which it would not forestall.

Later the court made its written opinion finding the apex to be in the Golden King and Bradley.

Thereupon before findings or decree was made, the appellant asked leave to file its amended counterclaim setting up an apex in the Golden King and Bradley.

The court refused to allow the amended counterclaim on the ground that the adjudication in this counterclaim would not preclude the appellant from setting up an apex in the Golden King and Bradley, and on the ground that it would be changing the cause of action.

This ruling was made at the instance of the attorneys for the respondent, who claimed that it would be a total change in the cause of action.

The appellant then asked that the decree should be entered without prejudice. This also was denied, and decree entered.

The appellant then asked leave to file an original counterclaim, but leave was denied, because it could be set up in a new action.

The counsel for the Grand Central Company conceded that the matters set up in the proposed pleading were not *res adjudicata*.

Yet it has been held by Judge Marshall in the United States Circuit Court in this very case, that the matter of apex in the Golden King and Bradley is *res adjudicata* by the decree entered by the judge in the lower court.

This seems to be in accordance with the decision of the circuit court of appeals in the case of *Hanley v. Beatty,* 117 Fed. Rep. 59.

When the appellant in the lower court asked leave to amend its counterclaim in order to allege its apex in the Golden King and Bradley, the following authorities were cited: *Connalley v. Peck,* 3 Cal. 75; *Neale v. Neale,* 9

Wall. 8; *Walton v. Jones,* 7 Utah 462-556; *Clark v. Kirby & Wilson,* 18 Utah 262; *Mining Co. v. Mining Co.,* 5 Utah 4-48; *Burs v. Franklin Coal Co.,* 106 Mass. 141; *Bernard v. Pomplitz,* 160 Mass. 164 and 162; *Church v. Holcomb,* 45 Mich. 39 and 40; *Slater v. Breese,* 36 Mich. 77-89 side paging; *Hampton v. Nicholson,* 23 N. J. Eq. 428; *Armstrong v. Ross,* 20 N. J. Eq. 121; *Ferry v. Pefifee,* 18 Wis. top paging 535 and side 510; Rev. Stat. of Utah, 1898, sec. 3001 and 3005; *Thomas v. Nelson,* 69 N. Y. 118.

## !| IV.

The court nowhere in the record gives its reason for approving the verdict of the jury. This court is bound to assume that those reasons are found in the instructions given in the lower court. These instructions constitute the lower court's view of the law and the requests which the lower court rejected, we contend gave the view that should have been taken.

The charge actually given by the court was numbered 9 in which the court charged the jury that the apex of the vein was the highest point at which vein matter was found, and "by vein matter in this connection I mean rock or earth containing mineral in quantities appreciably greater than is found in the general mass of the mountain."

The objections to this charge are apparent. It is a matter of common knowledge that veins are barren in places. The vein matter may not show anything more than a trace of the precious metals. As stated by Judge Hawley (58 Fed. Rep. at page 120): "Every vein or lode is liable to have barren spots and narrow places, as well as rich chimneys and pay chutes or large deposits of valuable ore. When the locator finds the rock in place, containing mineral, he has made a discovery within the meaning of the statute, whether the rock or earth is rich or poor, whether it assays high or low."

Again, it is a phenomena of common occurrence that veins where they are exposed to the action of surface water, become leached out. The minerals are taken up by the per-

colating water and deposited at lower points in the vein, leaving the upper parts of the vein to show no more than a trace of ·the precious metals. The lead, gold, silver and copper which were once there in the vein are leached down to a lower level, yet the vein remains with all its marked char· acteristics. It is on this account that both Mr. Akers, the appellant's expert, and Prof. Jenney, respondent's expert, say that assays are of little value except in connection with the situation surrounding the places from which they are taken. It may very well happen that in this particular vein at the surface we may have pay ore as at the apex stope and at another point on the vein in Tunnel B, or the Pit the vein may be defined yet it will assay little, if any, more than the country rock.

The error of the court is in ´making the assay value the sole criterion in determining whether a vein exists or not. If at a particular point the vein assays more than the country rock, the court says the vein is present. If at another place the vein assays no greater appreciable value than the country rock, the vein has ceased to exist. But if this rule holds good as you go lengthwise, the vein, is would hold as you. go down on the vein. And wherever you find a place in the vein that will not assay more than the country rock, the vein ceases to exist.

## V.

The result of this litigation, therefore, would be that ore bodies which the lower court held were apexed in the Golden King and Bradley, and which the court said were recoverable in a proper proceeding, are to be given to the respondent, simply because the lower court, misled by the respondent, made a mistake as to the effect of its adjudication.

It is perfectly plain that if the lower court had supposed that it was cutting off the appellant from all redress that it would have granted leave to amend.

It is just as apparent that if this error is not corrected in this court, the appellant will be denied redress for this error.

The Code is liberal in permitting amendments. This

court has repeatedly allowed them to be made. We cite the following authorities: *Mining Co. v. Mining Co.*, 5 Utah 3 and 48; *Steele v. Boley*, 7 Utah 64; *Neale v. Neale*, 9 Wallace 1 and 8; *Thompson v. Thompson*, 20 Utah 2-6; *Ogden v. Thorton*, 30 N. J. Eq. 572-574; *Thomas v. Nelson*, 69 N. Y. 118; *Jefferson County v. Ferguson*, 13 Ill. 33; *Chicago & C. Railway Co. v. Chicago Bank*, 134 U. S. 277 and 288.

In conclusion we ask the court to find in this equity case upon the evidence which is brought here for review, that the apex is in the first northern extension, lot 38.

If the court cannot so find, we ask a reversal of the decree for not permitting the amendment of the counterclaim.

## VI.

The defendant alleged in its complaint that the lode was very broad; that its apex overlapped both the westerly and easterly side lines of lot 38, but that at no point between the southerly end line of that claim and the 1,100-foot line did it wholly depart from that claim and that being so and lot 38 being the oldest location it took the entire width between those points. (*Mining Co. v. Mining Co.*, 5 Utah 3 and 54; *Flagstaff Silver Mining Co. v. Tarbut*, 98 U. S. 463.

When Crisman and others located lot 38, the lands in that vicinity on either side were vacant and unoccupied. This affords an inference that the locators saw what they believed to be indications of the apex of a vein in the claim. And the law is that a patent to a mining claim raises a conclusive presumption that there is the apex of a vein within it. (*Iron, Silver Mining Co. v. Campbell*, 17 Col. 267; 1 *Lindley on Mines* [1 Ed.], sec. 305 p. 306.)

## VII.

Had leave to file an amended counterclaim been granted it would not have changed the nature of the action; it would have remained an action to quiet title, for an accounting and for an injunction as before. The difference would have been in the description of the apex of the vein.

"The court may in furtherance of justice and on such

terms as may be proper allow a party to amend any pleading or proceeding by adding or striking out the name of any party or by correcting a mistake in the name of a party or a mistake in any other respect. . . . The court may likewise in its discretion after notice to the adverse party, allow upon such terms as may be just, an amendment to any pleading or proceeding in other particulars." (Sec. 3005, R. S. Utah.)

The amendment asked would have been in furtherance of justice. The court who tried this cause stated, when the advisory jury returned its verdict, that it inclined to the belief from the evidence that the apex of the vein was in the Jenkins, the Golden King and the Bradley, all owned by the defendant, but stated he would consider the evidence further and after further consideration and after argument at length by both parties, the court declared in clear and unmistakable language that the apex of the vein was in those claims owned by the defendant and again, in quite a lengthy opinion after the motion for leave to amend had been denied unhesitatingly reiterated the same unqualified opinion. Had the amendment asked been granted, it certainly would have been in furtherance of justice and to deny the motion certainly was not. If two parties are litigating the title to a piece of property it would be just to give it to the one who proves title to it and it would be unjust to give it to the party proven not to own it. The court found from the evidence and was of the opinion that the Mammoth Mining Company owned the vein but refused to allow it to say so in its complaint and gave the vein to the Grand Central Mining Company who it was of the opinion from the evidence did not own it.

## VIII.

The policy of our law is very liberal in favor of allowing amendments at any stage of the case in form or substance. They are uniformly allowed when the amendment will promote justice. (*Byers v. Franklin Coal Co.*, 106 Mass. 141; *Bernard v. Pomplitz*, 160 Mass. 164 and 162.)

"When the proof does not sustain the allegations of the bill and where by the proof the complainant would be entitled to relief in a court of equity, if his pleadings were properly framed, an amendment should be allowed and directed to conform the pleadings to the facts which ought to be in issue, in order to entitle the court to decree fully on the merits and whenever this is not done it is error." (*Connalley v. Peck*, 3 Cal. 75.)

. In furtherance of justice an amendment of the pleadings should be granted at any stage of the case. (*Neale v. Neale*, 9 Wall. 8; *Clark v. Kirby & Wilson*, 18 Utah 262; *Mining Co. v. Mining Co.*, 5 Utah 4-48; *Thompson v. Thompson*, 20 Utah 2-6; *Walton v. Jones*, 7 Utah 462-566; *Jefferson County v. Ferguson*, 13 Ill. 33 and note; *Chicago & C. Railway Co. v. Chicago Bank*, 134 U. S. 277 and 288; *Griffan v. Burgess*, 117 U. S. 181 and 195; *Thomas v. Nelson*, 69 N. Y. 118; *Wilson v. Cronell*, 32 Wis. 662; *Brayton v. Jones*, 5 Wis. 117 and 123.)

"Hill & Filken, 2 P. Wms. 12 Lord Macelisfied of his own motion ordered a bill to be amended on final hearing so as to raise an entirely new issue. Even appellate tribunals will reverse an order or decree and send a cause back to the court having original jurisdiction in order that an amendment may be made so that the real merits of the controversy may be settled." (*Ogden v. Thorton*, 30 N. J. Eq. 572-574; *Wilson v. Brown*, 13 N. J. Eq. 27£; *Hampton v. Nicholson*, 23 N. J. Eq. 428; *Henry v. Brown*, 8 N. J. Eq. 249 and 250; *Armstrong v. Ross*, 20 N. J. Eq. 121; *Ledos v. Ruppian*, 20 N. J. Eq. 160-165; *Church v. Wolcombe*, 45 Mich. 39 and 40; *Stater v. Breese*, 36 Mich. 77 and 89.)

## IX.

The respondent argues, first, the evidence as to apex, and then the instructions of the court upon the subject. The logical order is first to settle what the law means by an apex and then apply the evidence to the definition which the law gives.

The respondent first objects that the propositions stated by the court in its instructions to the jury are no criterion

of the views of the court upon the law. It then cites decisions which hold that in a chancery case with an advisory jury, error cannot be predicated upon the instructions to the jury. But that is not the point. It is one thing to predicate error upon those instructions. It is another thing to consult those instructions for the court's definition of the legal term it is using. Inferentially the respondent admits that the court's definition of the legal term, apex, is what is found in its instructions and that upon that definition the court found that appellant had no apex in Lot 38.

When we examine those instructions we find that the court conceives all veins as belonging to two classes. The first class consists of fissure veins with well-defined walls clearly separating the vein from the country rock, and of contact veins where the vein is found upon and along the line of contact between two different kinds of rock. The second class consists of ore deposits having no clearly defined walls.

Now it is apparent that Judge Hallett, in his charge in *Cheeseman v. Iron Silver Mining Company*—a charge which is sustained in 116 U. S. 529—was considering the two classes of ore deposits spoken of above. He speaks of mineral deposits that have well-defined boundaries. The charge is based upon that assumption. It is not at all strange that the court so proceeded, for at Leadville where the case arose there is the great contact deposit between porphyry and lime. Along this contact which is, of course, a clearly defined thing, the vein is found. The contention in that case was as to whether the vein was such a vein in the contact called a fissure or was a mere irregular bedded deposit laid down without reference to any fissure or contact. The language of the court in the decision last quoted was was made with reference to such physical conditions.

All the decisions, and we referred to them in our original brief, say that a location may be made of a "ledge appearing at the surface, not in the apex of ore, but in vein matter only." This is law in this State. Judge Beatty gives to this statement his weighty support. (*Harrington v. Chambers*, 3 Utah 115; *Burke v. McDonald.* 29 Pac. 98.) This remark is quoted with approval in *Book v. Justice M. Co.*, 58 Fed.

Rep. at page 126.   (1 Lindley on Mines [2 Ed.], sec. 308, p. 539.)

RESPONDENT'S POINTS.

The appellant assigns and relies upon two principal grounds for a reversal of the decree appealed from:

First.—That the court erred in finding that the vein mentioned in the counterclaim upon which the trial was had at its apex and on its strike leaves said lot 38 at a point 695 feet north of the south end line of said lot; because, as claimed by appellant, the evidence clearly establishes that the apex of said vein does in fact continue in said lot 38 to and beyond the 1,100-foot line.

Second.—That the court erred in refusing to permit appellant to file its proposed amendment to said counterclaim, and also in refusing to permit the filing of the proposed original counterclaim, in each of which it was alleged and claimed that the vein found at the south end of lot 38 did in fact at its apex and on its strike wholly depart from said lot 38 at the precise point where the court found and adjudged that it did depart. All other assignments of error are subordinate to these two, and are in support of one or the other of the two.

It must be seen at a glance that the two grounds upon which a reversal is sought are not merely inconsistent, but are diametrically opposed the one to the other; so much so that it is not possible for appellant to stand upon both grounds, and we respectfully submit that appellant should not be permitted to urge both grounds; it should be required to elect upon which of these two utterly inconsistent grounds it will rest its appeal, and be required to abandon the other. If the evidence justifies the finding that the vein does so depart from lot 38, then the claim that the court erred in so finding, is without support; if, on the other hand, the vein at its apex does not depart from lot 38, then the claim that the court erred in not permitting appellant to file an amendment to its, or an original, counterclaim setting up that it did in truth depart therefrom, is without merit. Appellant apparently is

certain of one thing only, namely: That it is exceedingly anxious to recover the ore bodies in controversy. In this regard it is not oppressed by any embarrassing uncertainties. But even after the four years of litigation that has been waged over the disputed property, appellant is not yet willing to say whether it will rest its claim to a recovery upon one or another of two grounds, notwithstanding one or the other of the two must of necessity be wholly without merit. Will this court seriously consider an appeal wherein a reversal is sought on grounds radically and fundamentally at war with each other? At least, will not the court require appellant at the outset to elect upon which of the two it will stand? As we have already said, the entire body of the evidence was directed to the question whether or not the vein continued in lot 38 to the 1,100-foot line, or departed from lot 38 at a point 695 feet north of the south end line thereof. Now, if appellant wishes to insist in this court that the trial court erred in finding that the vein did depart from lot 38, it becomes, of course, incumbent upon this court to examine this voluminous record with that degree of care necessary to enable it to say whether or not the evidence justifies the finding; but if appellant, on the other hand wishes to insist here that the court below erred in not permitting appellant to file a new pleading alleging that the vein did depart from lot 38 at the very point where the court below found it did, then there is no necessity whatever of examining at all the great mass of the evidence which was directed to the question whether or not there was the apex of a vein in lot 38 north of the point 695 north from the southerly end line of the claim. We very much question that there ever was a case where a litigant stood in the attitude before an appellate court, in which the appellant here appears. After years spent in preparation, at vast expense to both parties, after two trials, protracted and exhaustive, the appellant, though still vociferously asserting ownership in itself of the ore bodies in dispute, yet finds itself in such a state of uncertainty as to the merits of its claim that it is unwilling even now and in this court to say whether or not it will rest its claim of ownership

upon the ownership of a vein having its apex in lot 38 or upon the ownership of a vein having its apex in Golden King and Bradley Mining Claims. It would be strange indeed if the court should permit the owner of a mining claim to pass beyond his own boundaries, enter beneath the surface of the patented ground of his neighbor, and mine and extract ore thereform, basing his right so to do upon the claim that he was following the dip of a vein which had its apex in his territory, while he himself is unwilling or unable to say where he claims or believes the apex of the vein is in fact found.

The burden is upon the defendant to establish to the satisfaction of the court its title and right of possession to the ore bodies in controversy. (*Con. Wyoming Mg. Co. v. Champion Mg. Co.*, 63 *Fed. Rep.* 540. See cases there cited; see also *Doe v. Waterloo Mg. Co.*, 54 Fed. Rep. 935, read 937 and note cases therein cited.)

While protesting that we ought not to be put to the labor of discussing both of the alleged errors, yet we believe that a careful examination of the record will convince the court that threre is as little merit in the one as in the other. We take them up in their order: First, as to the sufficiency of the evidence to justify the finding that the vein mentioned in defendant's counterclaim wholly departed from lot 38 at a point 695 feet northerly from the south end line of said lot 38. The rule that this court will apply in determining whether or not the evidence is so sufficient is: That where thcre is a real and substantial conflict in the testimony upon which the finding rests, such finding will not be disturbed. (*Wilson v. Cunningham*, 24 Utah 167.)

But it is claimed further by the defendants that the court erred in itsinstructionsto the juryas to whatconstituted apex of the vein. There are several answers to this contention.

First.—This being an equity case, and the jufy advisory merely, error cannot be predicated upon instructions given or refused. (*Schneider v. Brown*, 85 Cal. 205; *Riley v. Martinelli*, 97 Cal. 575.) At page 585 the court says "Counsel then asked certain instructions in reference to actual and

constructive notice substantially as defined in the Code, which were refused by the court and the refusal excepted to. We think the court, of its own motion, instructed the jury as to the questions submitted as far as was necessary. It was an equity case, and the court adopted the answer of the jury, it is true, in its findings of fact, but it proceeded at length to find upon all the issues in the case." (This is just what was done in the case at bar.) "This being so, the refusal to give instructions is not cause for a reversal of the case. The evidence was sufficient to warrant the findings." (*Hewlett v. Pilcher,* 85 Cal. 542.)

Second.—Appellant in its opening brief at page 12, says: "The court nowhere in the record gives its reasons for approving the verdict of the jury. This court is bound to assume that those reasons are found in the instructions given in the lower court. These instructions constitute the lower court's view of the law."

We answer that this court is not only not bound to, but will not assume anything of the kind. It being an equity case, unless evidence, which it can be seen might have affected the result, has been erroneously excluded (and no such contention is made here), the only inquiry in the appellate court will be, first: Do the findings support the decree, and second, Does the evidence justify the finding?

In the case cited by appellant to another point, namely: *Midgeon v. Mon. Cen. Ry. Co.,* 77 Fed. it is said at page 253: "We shall not stop to inquire whether any of the reasons expressed by the court were irrelevant or erroneous. The point to be decided is whether the conclusions arrived at are sustained by the evidence and the law." (*Swetzer v. Dobbins,* 65 Cal. 529.)

Third.—The views expressed by the court in its instructions to the jury, as to what constituted the apex of a vein, were as favorable to the defendant as the law would permit. In the case in the 77 Fed. Rep., supra, it is said at page 255: "That the definition of a lode must always have special reference to the foundation, and peculiar characteristics of the particular district in which the lode or vein is found."

Instruction No. 9, of which complaint is made, must be read in connection with that portion of the charge which we have already quoted, and also in connection with instruction No. 10, for the charge is to be taken as a whole; and particularly with the first and last paragraphs of No. 10, the last being in this language: "Now, if you find that there is an apex of a vein, lode or ledge within the planes referred to in issue No. 4, then if such vein, lode or ledge is a fissure with well-defined boundaries and of such a character as the evidence establishes its identity throughout as a unit and shows that in its course downward into the earth it goes at such an angle as that it finally extends to and embraces the ore bodies referred to in issue No. 4, you should find that the vein extends upon its dip so as to include the ore bodies referred to, although in such fissure rock mineralized to an extent appreciably greater than the mass of the country is to be found only at considerable intervals and in small quantities."

And when the court proceeds to charge the jury as to what would be a sufficient tracing on the dip of a vein which consisted merely of a body of mineralized rock without any other boundaries than its own limit.

It is apparent that the court in its charge was guided by the rules laid down by Judge Hallett in the case of *Cheesman v. Iron Silver Mining Company,* in his charge to the jury in that case, which was adopted by the Supreme Court of the United States in the same case on appeal found in 116 U. S. 529 (see pages 533 to 538, inclusive).

See also *Stevens v. Williams,* 1 Morrison's Mining Reports 557, read 564, et seq.; *Cheesman v. Shreve,* 40 Fed. Rep. 787, read 789; *Hyman v. Wheeler,* 29 Fed. 347, read 353 to 356; *Doe v. Waterloo,* 54 Fed. Rep. 935; *Leadville Mining Company v. Fitzgerald,* 4 Mor. Mg. Reps. 380, read 386, 387.

Finally, on that branch of the case that we have thus far discussed we direct attention to the claim made in appellant's brief; that whatever would be a sufficient discovery of a vein to validate a location, would be sufficient evidence of apex to justify one in claiming the right to follow therefrom down-

wards beyond the side lines of his location, to and beneath the surface of his neighbor's property. As between conflicting lode claimants, the law is liberally construed in favor of the first locator in respect of the question of discovery, and, of course, it has been repeatedly held.that it is sufficient to validate the location that the locator finds rock in place containing mineral in sufficient quantities to justify him in expending his time and money in prospecting and developing the same whether the rock or earth is rich or poor, whether it assays high or low. In addition to the cases cited by appellant may be added.the case of *Book v. Justice Mining Company*, 48 Fed. Rep. 106, and *McShane v. Kenkle* (Montana), 44 Pac. 979, where even a more liberal rule is applied, the syllabus .being: "It is the finding of mineral in rock in place that constitutes the discovery, and it is not necessary that the vein or lode should contain mineral of such nature that a practical miner, if he encountered it, would feel justified in following it up, with a reasonable expectation of finding paying mineral."

We direct attention to the celebrated case of *Fitzgerald v. Clark*, 52 Am. St. Reps. 665 (s. c., 17 Mont. 100), where the court below refused to charge the jury that it would be a sufficient tracing of a vein on its dip, in a case involving extralateral rights, that the party asserting the right could follow such material or indications as a practical miner would follow in the expectation of finding ore. The appellate court affirmed the action of the court below. Also 1 Lindley on Mines (2 Ed.), section 336.

Coming now to the alleged errors of the lower court in refusing to permit the defendant to file an amendment to the counterclaim, and also in its refusal to permit the filing of the so-called original counterclaim, we say: That the offer to file the so-called amendment to the counterclaim, coming as it did after the evidence had closed, the arguments concluded, the verdict rendered and the court's statement that it concurred in the verdict of the jury, and proposing, as it did, to make a radical change in the issues upon which the case had been tried, and to set up an entirely new and different

theory from that upon which the defendant had proceeded throughout the trial, was too late, and at that stage of the proceedings the court had no authority under the statute to permit it to be filed. Sections 3001 and 3002 of the Revised Statutes deal with variances between the allegations and the proofs, which may be cured by an amendment to the pleadings, while section 3003 provides as follows: "Where, however, the allegation of the claim or defense to which the proof is directly is unproved, not in some particular or particulars only, but in its general scope and meaning, it is not to be deemed a case of variance within the last two sections, but a failure of proof."

The Supreme Court of California in the case of *Frost v. Witter,* 132 Cal. 421, at page 423, directs attention to the distinction between section 471 of the Code of Civil Procedure, which is the same as our section 3003, and sections 472 and 473 of the California Code of Civil Procedure, which are the same as section 3004 and 3005 of our statute, and say: "In considering the limit to the right of amendment, cases of amendment at the trial, for variance under sections 470 and 471 of the Code of Civil Procedure are to be distinguished from amendments under sections 472 and 473. With reference to the former, an express limit is established by the statute; with reference to the latter, this is not the case."

In the case of *Mining Co. v. Mining Co.,* 5 Utah 1, the court at page 49 impliedly, if not expressly, recognize that where the claim to which the proof is directed, is unproved in its general scope and meaning, the defect or failure cannot, under the statute, be cured by amendment.

To have allowed the defendant to file its proffered further counterclaim would have been nothing short of trifling with the administration of justice. (*Gubbins v. Laughtenschlager,* 75 Fed. Rep. 615; *Warner v. Godfrey,* 186 U. S. 365; *Chicago Ry. Co. v. Chicago Bank,* 134 U. S. 276; *Metropolitan National Bank v. St. Louis, etc., Co.,* 38 Fed. Rep. 57; *Mendenhall v. Harrisburg Water Power Co.,* 39 Pac. 399; *Richards v. Hupp,* 37 Pac. 920; *Shawyer v. Chamberlain,*

113 Iowa 742, 54 Cal. 562; 1 Enc. Pl. and Prac., 578; *Marshall v. Golden Fleece Mfg. Co.*, 16 Nev. 156.)

Again, the defendant would not have been permitted, even to have dismissed its counterclaim without prejudice at the late day at which it asked permission to file this proposed amendment. See Revised Statutes, sections 3181 and 3182. See also *Connor v. Drake*, 1 Ohio St. 170; *Bank v. Rose*, 1 Rich. Eq. (South Car.) 294; *Brunswick Grocery Co. v. B. & W. Ry. Co.*, 71 Am. St. Reps. 249; *Am. Bell Tel. Co. v. Western Union Tel. Co.*, 69 Fed. Rep. 666; *Heinlin v. Castro*, 22 Cal. 100; *Casey v. Jordon*, 68 Cal. 246.

We say that the proposed amendment to the counterclaim was properly denied, for the additional reason that it does not conform to the proofs nor anything properly in the record; neither does it conform even to the views expressed in the judge's opinion.

The proposed original counterclaim, which is found in Vol. 8, Ap. Ab., pages 219 to 225, fails to conform to the views expressed in the opinion in the same respects as we have already shown that the proposed amendment to the counterclaim so failed to conform, and in this additional particular, namely, that therein it is alleged that the vein after leaving the Golden King and entering the Bradley continued in the latter claim to the 1,100-foot line, or about 125 feet north of the station 427, where the court had stated in its opinion that the front vein terminated.

It further appears from the record that no application was made to file this so-called original counterclaim until some days after the counterclaim of the defendant had been dismissed, and a final decree entered in the cause, which decree was in full force and effect at the time the application was made. In other words, defendant was asking to file a pleading in a cause which had already been terminated and dismissed. (See *C. & A. R. R. Co. v. Union Rolling Mill Co.*, 109 U. S. 702.)

In the case of *Church v. Holcomb*, 45 Mich. 29, 40, cited by appellant to another point, it is said at page 40: "A

plain case for refusing an amendment at the hearing is where the case, after amendment, would be defective on the proof."

STATEMENT OF FACTS.

The plaintiff commenced this action on the 9th day of September, 1899, by filing a complaint in trespass, in the first count of which it alleged that the defendant had unlawfully mined, extracted, and removed from beneath the surface of the Silveropolis mining claim ores in quantity exceeding 6,000 tons, of the value of $300,000, and demanded judgment for that sum; and in the second count, after having made similar allegations as to the extraction and value of ores, it asked that the defendant be restrained from further mining operations underneath the surface of that claim, pending the trial of the cause. On October 16, 1899, the defendant filed an answer and counterclaim, alleging affirmatively, *inter alia,* that the ore bodies in controversy were in a vein which had its apex in the first northern extension of the Mammoth lode, designated as "U. S. Lot No. 38." To this answer and counterclaim an amendment was filed October 22, 1900, and on November 12, 1900, the defendant filed a second amended answer and counterclaim, alleging in each a vein in lot 38, which at its apex and on its strike crossed the southerly end line of that lot, and thence at its apex and on its course extended within the side lines of the lot to a point 1,100 feet northerly from said southerly end line; that the vein, on its dip from the apex, extended to, beneath, and beyond the Silveropolis and Consort mining claims, designated, respectively, "U. S. Lot No. 135" and "U. S. Lot No. 272," both owned by the plaintiff; and that the vein included all the ores lying beneath the surface of the Silveropolis and Consort mining claims south of a plane drawn parallel to the southerly end line of lot 38 and through a point 1,100 feet northerly therefrom. By this amended counterclaim the defendant sought to have its alleged title quieted as to all ore bodies lying within the Silveropolis and Consort mining claims south of the 1,100-foot plane. Answering this counterclaim, the plaintiff alleged it was the owner of all the ore

bodies in controversy by virtue of its ownership of the Silveropolis and Consort mining claims. Thereafter the court determined that the issues thus joined should be tried and decided prior to the trial of the plaintiff's action in trespass. Upon the trial of the case presented by such counterclaim and answer thereto, which commenced November 19, and ended December 31, 1900, the court found and decreed that the vein mentioned in the counterclaim at its apex and on its strike did not continue within lot 38 to the 1,100-foot line, but that the apex passed over the westerly side line of that lot and departed therefrom, at a point 700 feet north of the south end line of the lot, without again returning thereto, and dismissed the defendant's counterclaim. Afterwards, another judge presiding, as successor to the one before whom the case had been tried, the court on April 4, 1901, upon motion therefor, granted a new trial.

On November 20, 1901, the defendant filed its third amended answer and counterclaim, in each of which it, among other things, alleged that the vein and lode at its apex and on its strike crossed the southerly end line of lot 38, and thence continued northerly in that lot to the 1,100-foot line; that the apex of the vein was very broad, its width extending east of the east side line of lot 38, and overlapping portions of the Young Mammoth, Jenkins, Schley, and Bess mining claims, owned by the defendant; that its apex likewise extended west of the west side line of lot 38, and overlapped portions of the Jenkins, Golden King, and Bradley mining claims, also owned by the defendant; that at no point south of the 1,100-foot line did the apex wholly depart from lot 38, the lode upon its course conforming to the side lines of the lot; that lot 38 was the senior location, and long preceded all the other mining claims mentioned in the counterclaim; and that the vein on its dip to the west departed from the side lines of lot 38, passed under and beyond the surface limits of the Jenkins, Golden King, and Bradley mining claims, and extended, at a depth of 700 feet under the southerly end line of the Silveropolis mining claim, further on its dip to and beyond the limits of the Silveropolis and Consort mining

29 Utah—33

claims and embraced all the ore bodies lying underneath those claims south of the 1,100-foot plane. The prayer was that the defendant's title to those ore bodies be quieted against the adverse claim of the plaintiff. To this counterclaim, the plaintiff filed an answer, alleging that it was the owner of the Silveropolis and Consort mining claims, and of all veins and ores therein or thereunder and within planes extended down vertically through the boundary lines of those claims. On the issues thus formed the case was again tried. The trial was commenced on November 21, 1901, when a jury was ordered impaneled advisory to the court to pass on certain issues, among them, in substance, the following: How far northerly toward the 1,100-foot line does the apex of the vein on its course extend in lot 38? If the apex of the vein on its course wholly departs from the limits of lot 38 before reaching the 1,100-foot line, then at what point on its course does it so depart? Does there exist, within the limits of lot 38, and between the southerly end line of the Silveropolis mining claim extended eastward in its own direction across lot 38 and south of the 1,100-foot line, any part of the apex of any vein, lode or ledge, or any part of any vein, lode or ledge, which vein, lode, or ledge on its dip extends to and includes the ore bodies known to exist beneath the surface of the Silveropolis and Consort mining claims south of the 1,100-foot plane? Do those ore bodies belong to or are they a part of any vein, lode, or ledge that has its apex, or any part of its apex, in lot 38?

Such were the issues upon which the cause was tried. The question of damages, under the suit in trespass for ores extracted from the ground in controversy, was not made an issue in the case presented, and no evidence was introduced upon that subject. The contention of the defendant throughout the trial was that the ore bodies in dispute lie in a vein which has its apex in lot 38, and which, on its strike and at its apex, crosses the southerly end line of that lot, and continues within its limits to a point at least 1,100 feet north from such end line; while on the part of the plaintiff it was insisted that the vein, which at its apex and on its course crosses the southerly

end line of lot 38, wholly departs from the lot at a point 695 feet north from the southwest corner thereof, where it crosses the westerly side line. In the introduction of evidence the parties assume a wide range, both as to surface showings and indications and as to underground workings. The surface of the mining claims and the various tunnels and levels of the miners are represented by both sides with numerous maps and with a very interesting glass model by the defendant. They are of great utility in acquiring a proper understanding of this controversy, and are, in the most important parts, presented herein in the shape of diagrams. The mining ground in question is situate in the Tintic mining district, Juab county, Utah.

DIAGRAM NO. 1.

Diagram No. 1, given below, is in part a copy of Defendant's Exhibits A and K and Plaintiff's Exhibits 12, surface maps.

On this diagram are shown, so far as material here, the surface boundaries of the property owned by the parties. The first northern extension of the Mammoth claim (U. S. Lot No. 38), the Jenkins (U. S. Lot No. 93), the Golden King (U. S. lot No. 92), the Bradley (U. S. lot No. 158), the Young Mammoth (U. S. lot No. 94), and the Schley mining claims are owned by the defendant; and the Silveropolis (U. S. lot 135), the Consort (U. S. lot No. 272), and the King William mining claims are owned by the plaintiff. The ground in dispute is that part of the Silveropolis and Consort mining claims lying south of the 1,100-foot line. The stipple shading on lot 38, which overlaps the claim, shows the width of the apex and course of the vein as claimed by the defendant. The lines W-U, U-T, and T-S represent the course or strike of the vein as claimed by plaintiff, and indicate the line of stoping in the mines along the vein, claimed by the defendant to be on its dip, by the plaintiff on its strike. The point U is 695 feet from the southwest corner of lot 38, and is where the plaintiff claims the vein changes from a

DIAGRAM Nº 1

course N. 15° E. to a course N. 51° 30' W., true, and departs wholly from the limits of lot 38, continuing in that course to the point T, when it again changes, and thence continues N. about 10° to 15° W. in the direction of the point S. The line K-K indicates a section through the Peterson winze in the Grand Central mine, H-H a section through southern end of Silveropolis claim, E-E a plane about 150 feet north of the south end line of that claim, and F-F a longitudinal projection. Numerous open cuts, made by the defendant for the purposes of this case and claimed by it to expose the apex of the vein, are indicated on lot 38. Tunnels, Mammoth and Grand Central shafts, and other points of more or less importance are also located on the diagram. The 1,100 and 1,700 foot lines and the southerly end line of the Silveropolis mining claim extended likewise appear thereon. Some of the principal stopes are indicated thereon, including the Cunningham of the Mammoth, where the plaintiff insists the vein wholly departs from lot 38, and the Butterfly of the Grand Central. The dykes also appear.

In determining the rights of the parties to the ore bodies in dispute, lot 38 is of principal importance. That lot or claim was patented May 16, 1873, and all the other claims herein referred to are junior to it as to location and patent. Lot 38 is 200 feet wide and 3,000 feet long, and from its southerly end line its side lines run N. 18° 55' E., which direction indicates the general course of the apex of the vein, as claimed by the defendant.

DIAGRAM NO. 2.

Diagram No. 2 is produced from Defendant's Exhibits B, C, D, F, G, H, and I, and Plaintiff's Exhibits Nos. 1, 2, 3, 6, 7, 8, and 16, maps representing portions of the mines of the parties.

On this diagram each one of the principal stopes shown by the evidence and material to this decision, is represented and marked with a figure corresponding with the number of the level on which the stope is located. They show where, in the

# DIAGRAM Nº 2

various tunnels and parts of both mines, merchantable ore was found. Those of most importance, in the consideration of the questions before the court, are the Gillespie, Apex, Gulf, Flanders, Burleigh, Naylor, Cunningham, Caved, Klondyke, Betsy, and Butterfly stopes. There are also designated on the diagram tunnels and drifts where no ore was found and no stoping done, being driven into barren ground in search for ore. The Mammoth and Grand Central shafts, the Tranter drift, the drift to the north end line Golden King claim 800 level, drift connections between the Mammoth and Grand Central mines, east and west cross-cuts, Turner raise, Dago raise, O'Brien winze, Bush winze, the Condon and Golden King tunnels, and other objects, to which reference is made herein, are designated on the diagram, to show, as near as may be, their location and character, and to enable one to judge the more readily of the indications they furnish, as bearing upon the reasonableness or unreasonableness of the theories of either of the parties respecting the strike of the vein or lode, the location of the apex, its width, the dip of the vein westerly, and its continuity and persistency on its dip downward to the ore bodies in controversy.

DIAGRAM NO. 3.

Diagram No. 3 is a copy of the Defendant's Exhibit E and of the Plaintiff's Exhibit 4, maps representing the 400 level in both mines.

On this diagram are represented the dykes and their junction, the Betsy stope, the Bush winze, the Hatton raise, Bucket raise, and important points around and connected with the Betsy stope country. Stations 427, 401, 15, and 84 also appear hereon. Stations 15 and 84 represent the same point where the winze goes down to the Butterfly stope. There is evidence to the effect that on this level the vein, about 45 feet north of station 92 at the south end line of the Golden King claim, fork; the one fork passing north in the direction of the drift in line of stations a, b, c, d, e, 99, etc., and the other coursing west of north. What is called the "80-foot

level" is between this and the 300 level. Here, on the 400, in connection with the 80-foot level, is where the trial judge, in a written opinion, claimed there are shown two veins, one of which he said embraced the ore bodies in dispute, and terminated at station 427, which is a little north of the Betsy stope.

### DIAGRAM NO. 4.

Diagram No. 4, is a copy of Defendant's Exhibit L, section H-H, presenting a vertical cross-section of the vein and the Finn dyke.

This diagram represents a projection on plane H-H, looking north. It is intended to show a section of the vein on its dip, according to defendant's theory, as it passes from its alleged apex; a part, called the "back fissure," almost vertically to the deep, and the westerly portion thereof on its dip through the Finn dyke to the ore bodies in dispute under the Silveropolis and Consort claims. On the diagram the east portion or "back fissure" is indicated by light, the dyke by heavy, and the west vein by light stipple, shading, and the stoping by hatching. The line H-H is practically parallel with and about 25 feet north of the Silveropolis south end line extended, and the surface line and the levels and tunnels cut by the plane drawn to the 900 are indicated on the diagram.

# DIAGRAM Nº 4

## SECTION H-H
### LOOKING NORTH

DIAGRAM NO. 5.

Diagram No. 5 is produced from Plaintiff's Exhibits 17 and 26, maps of projections on line of stoping in both Mammoth and Grand Central mines.

This diagram represents projections of the mines of both parties. The contour of the surface along the line of projection, the different levels of the Mammoth mine down to the 1,900 and of the Grand Central to the 1,100, the different stopes, and line of stoping showing the line of greatest mineralization, are all indicated on this diagram. It presents a comprehensive view of the development and explorations of these vast properties. The plane W-U, extends from the southerly end line of lot 38, on a course N. 7° 15′ E., true, and the projection presents a longitudinal section of the vein, on its strike and dip, within the limits of lot 38 to the point U, to which point the defendant is admittedly the owner of the vein. This section shows the "east or back fissure," on its dip to the deep to be almost vertical. Here the apex of the vein is also admittedly within the limits of lot 38. The plane U-T extends from the point U, near the west side line of lot 38, where the plaintiff claims the vein departs from that lot, on a course N. 51° 30′ W., true, to the point T. The plaintiff insists that the projection on this plane exposes the vein on its strike and dip, while the defendant contends that its dip only is exposed, and that the apex is still within lot 38, and its strike parallel with the side lines of that lot. The contentions of the parties are the same as to the projection on the plane T-S, the course of which plane is N. 2° 15′ E., true. The dispute as to these two projections is as to whether they expose the ore bodies on the strike or on the dip of the vein.

## DIAGRAM No 5

This diagram represents the dykes and their junction, on the various levels down to and including the 800, with reference to the Silveropolis south end line extended, or a plane drawn vertically down through that end line. The courses of the dykes also appear.

The diagrams, thus made a part hereof, represent, although in a very condensed and diminutive form, the numerous maps in evidence, and are deemed sufficient to present, by way of illustration, the real situation and conditions of the subject-matter in controversy. They are intended to obviate extended reference to the descriptive part of the evidence, which otherwise would be necessary to a proper understanding of this controversy and of its determination. The record is so voluminous, the printed abstract thereof containing several thousand pages, as to preclude reference to the evidence, except only as to the most material points. The trial having commenced on November 21, 1901, continued from day to day until February 1, 1902. The only issues tried were those formed by the defendant's last counterclaim and the answer thereto. The defendant introduced a vast amount of evidence for the purpose of showing that the vein or lode continued at its apex and on its course and strike within lot 38 from its south end line and beyond the 1,100-foot line, and that the same was continuous and persistent on its dip to and beyond the Silveropolis and Consort mining claims, and embraced all ore bodies found in either of those claims lying south of the 1,100-foot plane. This evidence took a wide range, exposing the character of the open cuts, represented on diagram 1, to show their indications of an apex, and the character of the numerous tunnels, stopes, and workings of the mines was revealed with much care and skill, in an effort to establish the fact that the ore bodes in question were embraced within a vein which had its apex in lot 38. Much evidence was introduced by the defendant to show that the vein passed through the dykes on its dip and not on its strike, that the vein consisted of a system of fissures; and that between the 300 and 400 levels one part of it, the "back fissures," passed almost vertically to the deep, and the western part passed, on its dip, through

DIAGRAM Nº6

the Finn dyke, and included the ore bodies in dispute. The plaintiff introduced a vast amount of evidence to show that the vein wholly departed from lot 38 at a point about 695 feet north of the south end line of that lot, and did not continue within the limits thereof north of that point, either at its apex or on its course or strike, but from that point proceeded, on a course N. about 70° W., magnetic, in the direction of the U-T, and thence N. 10° to 15° W., magnetic, in the direction of the line T-S. The introduction of this evidence also embraced a wide range. The effort was to show that the character of the material in the open cuts, north of the point U, was not materially or practically different from that found generally in the limestone area either east or west of lot 38; that such material as was found in those cuts, consisting only of limestone, quartz, calcite, and earth stained with different forms of iron oxides and manganese, without any appreciable value of any of the precious metals, was not necessarily indicative of vein in that district; that the same kind of fractures and crushed material, occurring within the limits of lot 38 north of the point U, also existed in the limestone east and west of that lot; that no apex appeared on the surface of lot 38 north of the point U; that the vein in dispute, at the northern limit of the Cunningham stope, near the point U, crossed the western side line of that lot, passed through the dykes, and proceeded on its strike in the direction of the lines U-T and T-S; and that there has been faulting along the Finn dyke, which had caused either a drop in the hanging wall or a raise in the foot wall country, accounting for the difference in the elevation of the ore bodies in the two mines. The maps on both sides substantially agree in what is represented. The results of the assays of very many samples of material taken from the surface and underground workings were introduced in evidence.

On the subject of subsurface explorations the witness, Akers, for the defendant, in part testified: "The highest workings, and I may add, also, the highest workings of any magnitude, within lot 38, is what is known as the 'Condon tunnel.' Its elevation is 7,209 feet above the sea level. It is run out

first through country rock, the general limestone of the mountain, until it reaches this dyke. The entire cross-cut is in shattered, broken, stained, altered vein material to its face." The Condon tunnel, the witness says, goes through the same kind of vein material to the surface; also the Condon winze, which, he says, goes down from the Condon tunnel, to the Finn level, 175 feet, in a streak of the vein, and then the O'Brien winze continues down in the same material to the 300 or Mammoth tunnel level. He says: "The Finn tunnel enters the surface at the point about 25 feet west of the west side line of the Golden King location, a distance of 51 feet from survey station No. 7,036." This tunnel follows practically the foot wall of the Finn dyke, and the witness says that from the foot of the Condon winze north it follows a streak of vein, and that near the foot of the winze at raise No. 7, on the Finn level, there is stoping. He further testified that the Finn tunnel from its mouth runs in as a cross-cut until it reaches the vein, and that "the most easterly workings on the Finn tunnel at a point in the Finn tunnel cross-cut where we have vein matter, it is shattered, rather broken towards its face. I can say it is within the vein, and within a few feet of it ore might be disclosed. Speaking generally, there is no working south from this point on this level, nor is there from the Finn tunnel level in the cross-cut. In those instances, from intersection on the surface, I should say that a cross-cut drifting out almost in any one along through the Finn tunnel level, in other words, would stand a stronger probability of encountering ore." He also says that "from the stope in the Finn level the Trapeze raise goes through to the surface, and is there known as 'incline No. 1,' " and that dyke is also defined in the Golden King level, is 41 feet above the Finn level, and "the Finn tunnel wall shows fractured streak altered limestone to its face." The witness Learned says that the Finn tunnel cross-cut, from where it leaves the tunnel near station 03, "going westerly through 021, 21, and 24, thence to the face, is in vein lime," and that broken lime is usually vein lime in that mine. The Plummer tunnel enters the mountain at a point 45 feet from corner No. 4 of lot

38, and Mr. Akers testifies that the tunnel is in vein and ore at the south end and to its north end shows ore in places, shattered lime, and vein matter. North of the East raise stope the tunnel runs along the east side of the dyke and shows the point called the bottom of the O'Brien winze, although that winze down to the 300 level, and, according to the statement of the witness, discloses ore. The witness, having had his attention directed to station T on the 200 level of the Grand Central, where there is a winze and where some ore was represented on the map by coloring, testified: "Q. What was it intended to represent? A. A little detached ore streak, which, in my opinion, had no continuity in any direction. Q. Is it possible, then, to have ore bodies without continuity in any direction in this country? A. Well it might have come along some minor fracture and been a branch or stringer leading off from that fracture, forming ore at that point. Q. Does it form ore there? A. Yes." Respecting the Mammoth tunnel or 300 level, the testimony of the witness is to the effect that the workings are in ore from the shaft north to the Bush winze, at the north end of the Betsy stope; that the Bush winze starts down on the east side of the Finn dyke, and passes through the dyke 63 feet above the 400 level, and at that point "the vein branches in its downward course into the earth, the minor portion, the small portion, going down almost vertically, and the major portion passing through the dyke to the westward"; and that at the Watson winze, north of the 1,100-foot line, the vein has also passed through the dyke and ore is revealed in that winze. Further testifying, he said: "As we proceed northerly we find the vein diverging, the intersection of the dyke having been at the point, rather the plane of the crossing of the dyke and vein will always be an ascending inclination going northerly, and for that reason we have what I believe to be this portion of the vein disclosed with the Watson winze."

It will be noticed from the testimony and diagrams that north of the Bush winze the main tunnel follows the foot wall of the dyke, but there is a branch running from the winze at station 31a, and another from station 32, to the Dago raise

29 Utah—34

and across the north end line of the Golden King claim, with a branch from station 184 in a westerly direction to and beyond station 186; also a cross-cut from station 36, running west to a point near the western side line of the Golden King claim and thence northerly a considerable distance. While the testimony of the witness refers to vein matter, crushed limestone, clay material, and the like, it does not show that ore of any considerable quantity was ever found in any of those northern workings beyond the Bush winze. Respecting the branches of the vein as claimed by him, the witness testified: "The foot wall of the dyke would be the hanging wall of the easterly branch of that vein, and that portion of the vein remains on this side of the dyke. The western branch of the vein is not distinctly divided in that cross-cut; hence I am unable to say whether it is between stations 107 and 26 in the drift that has been run, or whether it approaches more nearly station 107, or rather the western limit of the dyke, Q. Going west to the foot wall of the dyke, from [station] 187 to 31A, in the face have you any ore? A. It is not commercial ore. We have shattered lime and clay. Q. Didn't you say that the only line of demarkation that you had between the ore in the east vein and the ore in the west vein is that dyke? A. I did. Q. If that is the only line of demarkation, why wouldn't you take that as a foot wall of the westerly branch? A. Because there are conditions west of that point that you name, that is crushed and shattered lime and clay filling in the mass of the country, and there is no particular portion where it is—where the crushing ceases and the solidity begins."

The workings on the 400 level extends north to within about 50 feet of the 1,100-foot line, and the witness testified that on that level the "dyke and the vein" are "closely intermixed;" that the corkscrew raise, just north of station 86, is in stoping ground; that a winze between stations 101 and 103 goes down into old crushed stopes above the 500 level; that the Bush winze extends to this level, after passing through the dyke; that the main portion of the vein is west of the dyke on the 400 level; that the Hatton raise shows

mineral and vein matter from the 400 to the 500 level; that the workings of the Grand Central mine on this level are mainly above the vein, but where the drift passes off to the north at station 17 there is a showing of vein matter, and at station 15 there is a winze going to the Butterfly stope, and as to this winze he testified: "Q. Does this winze from the 400, at the top of which you have ore, go vertically down into ore in the 600 level? A. It does, sir, into what I believe to be the hanging wall of the vein there." He has discovered no foot wall on this level, but has found the hanging wall at the face of the Grand Central 400 level east of station X. On the Mammoth side "the main level," says the witness, "follows the vein foot for foot on the 400, and is quite extensively stoped to a point marked 'Raise,' distant 45 feet north of the south end line of lot 92, Golden King location, where it forks, one portion continuing approximately in the direction of the main drift, and the other diverging more to the northwest. Both of these workings show branches of a vein, and the McIntyre winze, of which we have the top on the 300-foot level, is shown." The witness also testified: "Q. Now, I draw your attention to the 80-foot level again, and ask you what you have at that level, there intermediate between the 300 and 400? A. It is on continuous ore throughout, as is also the winze marked 'Bucket raise' down to the 400. Q. How far up there do you go? A. About 30 feet. It is called the 'Copper raise.' I could see a drift leading off—an incline working, rather. It looked as though the ground had been stoped beyond. The drift running off went in a generally northerly direction on the 400 level. There is found the stope marked the 'Betsy stope,' and also the stope marked the 'Klondyke stope;' the Klondyke stope being the larger of the two on that level. The Betsy stope is indicated upon this level as caved."

On the 500 level, the main tunnel is east of the dyke, and from station 543 north follows along and in the foot wall of the dyke. At station 537 a drift departs from the tunnel in a northwesterly direction to and beyond station 557. As to that drift the witness in part testified: "Q. What have

you in that cross-cut out to its intersection with the dyke? A. We have limestone that shows very little shattering. Q. What have you as you go through the dyke? A. We have the dyke and the vein a good deal mixed there. Q. Have you any part of the vein in that cross-cut as it traverses that dyke? A. My recollection is that we have, sir. Q. Look at your notes? A. I have no notes concerning it. Q. Is it not as barren as any other portion of that dyke? A. No, sir; not in my recollection. Q. Does it carry ore? A. I can't say positively as to that. Q. Does it carry anything that will yield a trace? A. Well, my notation on that is not very clear. Q. Can you say? A. I will not say." From the workings, disclosed by the testimony of the witness and the maps relating to the 500 level, it seems the ore and mineralization decrease and the ore gradually fades out within a comparatively short distance, either north or south, from the ore bodies which would be cut by a plane drawn vertically down through the Silveropolis south end line extended. The top of the Butterfly stope of the Grand Central mine appears on this level.

On the 600 level, the workings also present the appearance of the ore fading out as one proceeds north or south from the main ore bodies. The witness says: "The Earl raise on the 600 goes up to the 500, and from there you go south entirely within ore, to a point marked station 43, and thence on; I have marked the station 43½ where you encounter the cross-cut running in a westerly direction for a distance of 80 feet, where you reach the stope, now caved. That stope is stoped out continuously through to the 800-foot level. The stope on the 600 is one of the ore bodies in dispute, and is part of the vein in dispute. The crushed stope on the 600 goes down to the 700 on plane F-F on the longitudinal projection. Q. Where do you find the apex of the vein, which you describe lying along from the 600 down to the 800, and below it? A. Within lot 38, and overlapping, both east and west, lot 38; lot 38 not being wide enough to cover the apex, in my opinion." The witness also states, as his opinion, that the back vein is a "stringer or drop-

per" from the main vein; that the ore bodies and vein, under the south end of the Silveropolis claim, on the 600 level, clear down to the 800 and below, are within and on either side of the side lines of lot 38, and that the vein consists of a "series of fractures having a course generally of about N. 20° E. by S. 20° W. in the upper portion." On this level there are two parallel drifts running nearly parallel with the dyke, and at station 49 of the westerly drift there departs a west cross-cut into the Silveropolis ground, where, the witness says, it has reached the vein. At station 643 of the easterly drift there is an east cross-cut extending to the east side line of lot 38, and a west cross-cut extending to the west side line of lot 92. The cross-cut, the witness states, is in hard blocky lime from station 643 for a distance of 468 feet, where he claims he encountered an independent vein consisting of crushed and iron-stained material. He further states that he has not found the foot wall of the vein on this level, but believes it is about 20 feet east of station 643. The hanging wall, he says, is at or near station 5 of the Grand Central 600 level. The witness McIntyre testified that the west cross-cut was in vein material, and that these cross-cuts were made about 15 or 16 years ago. On this level the Butterfly stope has been productive of much ore. As to the ore on the 600 level, with respect to the dip and apex of the vein in which it is found, the witness Earnshaw testified: "Q. Do you think the ore in the Grand Central workings on the 600 also finds an apex in lot 38? A. I think so; yes. Q. You have no idea what angle of dip would be requisite to carry you from that 600 level into lot 38, have you? A. No, sir. Q. It [the distance] would be over 1,500 feet, would it not? A. Somewhere thereabout. Q. But still your opinion is that any work paralleling that—without knowing the distance, your opinion is that this Butterfly stope and the ore north of it on the 600 level finds an apex in lot 38? A. I think it does."

On the 700 level is the cross-cut, 600 feet in length, from station 25 on the Mammoth side to station 15 on the side of

the Grand Central, in which cross-cut connection was made
between the two mines at station 18, appellant's map. The
witness Akers says that the material through which that
cross-cut runs is dyke and fractured limestone; the witness
McIntyre, that it is in barren rock throughout; and the wit-
ness Watson and Cox corroborate this. The witness Akers
also stated he had not found the foot wall of the vein on
this level, but thought the hanging wall was about 30 feet
west of station 9 in the main Grand Central cross-cut. Con-
nection between the two mines is also made near station 7
at the Bradley-Consort line, in the main drift. The witness
says there are two branches of the dyke on the 700. They
diverge, going north, as on the levels above and below. Re-
ferring to the main vein in the Grand Central ground, the
witness, after stating that its course was "about N. 15°
to 20° W.," testified: "Q. Now what is the distance
between that cross-cut that is midway between 15 and 16
back to the boundary line between the Consort and the Brad-
ley? A. I make it 1,110 feet, sir. ·Q. How far northerly
have you, not only what you call vein material, but actual
ore? A. Why it is mineralized quite generously, I think.
Q. Now, it being 1,110 feet between the points you now give,
how far do we have actual ore stoped along that level? A.
The stopes, sir, I could not say. I said good ore. Q. Have
you in that part of the work in the Grand Central 700 fissures
or a series of fissures? A. Yes, sir. Q. Could you follow them
from where you have the most northerly ore clear back to the
Consort-Bradley line? A. We followed them, yes. Wheth-
er that be along the central portion of the system of fractures
I cannot say. Q. Now, when you get to the Consort-Bradley
line, the ore makes off southeasterly as shown upon that map?
A. The stopes make off southeasterly. I was going to say
that the ore as far I saw it continues southeasterly." Speak-
ing of a series of fissures, the witness testified: "Q. Could
you follow them from where you have the most northerly ore
clear back to the Consort-Bradley line? A. We followed
them, yes. Whether that be along the central portion of the
system of fractures I cannot say. Q. And about what is the

course of that line of fractures on the 700? A. N. 15°
to 20° W." The testimony of the witness Learned shows
that from a point north of the Silveropolis north end
line, about station 15, going southerly there is practically con-
tinous ore on the level to near the Bradley-Consort line, a
distance of about 1,100 feet, where the ore bodies change to
a southeasterly direction and continue about 300 feet further
in that direction.

On the 800 level is the Tranter drift, which connects the
two mines. The witness Akers testified: "Q. How many
branches or streaks of the vein have we on the 800 level alto-
gether. A. Altogether there are four shown on the map. I
have not been able to fix the foot wall of the entire vein any-
where on this level." But he thought he had found the hang-
ing wall 20 feet northwest of station 24 in the King William
Claim, at which station, in his opinion, the vein passes "out
of working to the northeast." The witness further tes-
tified: "Q. Now, give me the most extremely northern
ore you found on the 800 level of the Grand Central, from
the Consort and Bradley, and then give us the length? A.
The face is in ore, but I don't know that the entire working
from corner 5 to point 30 feet north of the working marked
'winze' under the King William surface, is in ore through-
out its entire length. It is substantially, however, in vein
from a point which I understand to be station 8; thence
north, to the working marked 'Dago winze,' I am in lime-
stone, but would add to that that I believe the vein to be
slightly to the west of that drift. Q. Passing thence north
through stations 13 and 14, out to raise 15, what have you?
A. I have the vein passing out of the drift, practically at
station 15, going on to raise 15. I am in vein between station
14 and 15, and the workings on to the east, and to the west;
but I have no notation covering the raise at station 15, con-
cerning which you have questioned me. From station 15
to 16 I have quartz there in the working, and ore just to the
west and at the south vein, and running from station 16 to
17 I have highly silicified lime for that 30 feet, and from sta-
tion 17 northerly I have vein, though I can not say whether

the ore is merchantable or not.  Q. Now, when you go to the
Consort-Bradley line, the ore makes off southeast, as shown
on this map?  A.  The stope makes off."  The witness Watson
described the workings, including the Tranter drift, of the
Mammoth 800 level, as follows:  "From station 4 to station
6 it is in line, and in cross-cut from station 4 to the west we
have shattered lime, out to station 120.   Then we have vein
and ore, and a drift running to the south in the main or east
drift.   Running northerly and southerly we have vein-carry-
ing ore.   Now, along Tranter drift, that runs from the drift
I last spoke of towards the west, between stations 9 and 10,
blocky lime, and  somewhat softened in places, along a bed-
ding plane.   It is lime and fissured in some places in vien
material, down to near station 11, and from there it is dyke
material, 65 feet with the dyke, on clearly defined; and after
passing the dyke material we have, as nearly as I can make it,
from there on to the stope, broken lime, crushed; and now,
taking the drift, we get it just before reaching the stope, that
runs to the southward, that is in vein material.   In that drift
we have a winze and raise, and the winze goes down to the
900, and I am not positive, but I think the raise goes up
to the drift, just above the 800 level."   The witness says the
workings to the north of the Tranter drift are through shat-
tered and stained limestone to above station 159, where, in
a drift running west, he says, there is a winze with copper
ore in it, and beyond that station north to the end there is
vein material.   He also stated in effect that the develop-
ments in the mines had not been sufficient for him to deter-
mine whether, on any level, the workings extended easterly
beyond the foot wall boundary of the vein.

On the 900 and lower levels the conditions, so far as the
developments are shown, are similar to those on the 800 and
700.   The diagrams indicate sufficiently the depth to which
the developments in both mines extend.   The testimony of
witnesses for the defendant shows not only that the vein on
the various levels consists of a series of fractures or fissures,

some extending northerly and southerly; some northwesterly and southeasterly, and others northeasterly and southwesterly, but also that in both mines the strata or bedding planes were broken and shattered, and titled in "every conceivable direction and to all degrees and angles of inclination."

Respecting the width or exterior limits of the vein, the witness Akers testified: "The boundaries of this vein would be the limits of the fracturing which had occurred and been produced by the dynamic forces exerted in creating the vein. Q. And so far as that fracturing extended, so far you would claim your vein extended? A. Plus any additional width of ore or vein matter that might be produced by metasomatic change. Q. Would you claim that the limits of your vein were coincident with the limits of the fracturing? A. No, sir; not where replacement had changed the limits of the fracturing. Q. Would you claim that your vein extended at least as far as the limits of the fracturing? A. Yes, sir." The witness also stated that the vein was a "fissured section of limestone," and the witness Watson testified that, as he understood it, the vein was "bounded by the fissuring," and that "if the fissuring were all connected" and "extended 4,000 feet" he would say the vein extended that far. He could not determine from the developments on any level whether any of the workings extended beyond the foot wall boundary of the vein. From the testimony of the witness McIntire it appears the vein, as shown by the developments, on the 900 level is nearly 900 feet wide, on the 700 level 1,050, and on the 600 level 1,020 feet in width. This witness said that if, on the 700 level, a cross-cut were driven through barren limestone all the way from M, a point at the northerly workings of the Grand Central, easterly to M-4, a point at eastern limit of the vein, as fixed by him, distance 1,050 feet, and ore bodies appeared at M. and M-4, he would conclude they were in the same vein.

Respecting the "back fissure," the witness McIntyre, speaking of the 800 level, says that from station A, near that end line extended through stations 153, 155, 157, and beyond

the 1,100 foot line, it is in ore all the way, and is what is called the "back fissure;" and, referring to the 700 level, he said; "Q. Going again to the ore here east of station 33, at the point marked 'Raise,' and directing your attention to the the ore and vein matter, which you stated you had there northerly along that drift to and beyond the 1,100-foot line, I will ask you if that is not what you call the back fissure? A. I call it the back fissure." The witness also says that on the 600 level the main drift, from station 40 to the 1,100-foot line, is in the back fissure and in vein matter; that on the 500 level the drift running from station 80, past raise from the Silveropolis south end line extended, stations 81, 82, and 583, to 542 on the 1,100-line, is in ore and on the back fissure; that on the 400 level the back fissure extends from the raise north of station 92, thence north through stations a, b, c, and d to the face of the drift, and thence on through station 99, being where it crosses the Silveropolis south end line, 90 feet west of the west side line of lot 38; that on the 300 or Mammoth tunnel level, the main drift runs across the Silveropolis south end line through stations 9 to 17, and on through stations 109 and 22, across the 1,100-foot line, is in the back fissure through the Betsy stope, and that such back fissure is 10 or 15 feet west of where the drift crosses that end line, the witness at the same time stating that the Betsy stope was extended to the 800 level since this suit was commenced, but was extended down to the 400 "a good many years ago, and below the 400;" that on the Plummer tunnel level, the drift extending northerly across that same end line through the O'Brien winze near the 1,100-foot line and across that line, is "in what is called the 'back fissure' below, and it is in ore all the way" between those lines, some of it being "low grade ore, some good ore;" and that, on the Finn tunnel level, the drift running northerly from station 03 across the same end line through stations 05 09, and the O'Brien winze to the 1,100-foot line, is in "what is called the 'back fissure,'" and is in "low grade ore practically all the way." The witness also testified that on each of the last two levels mentioned the distance from the

point where the back fissure crossed the Silveropolis south end line extended to west side line of lot 38 is 90 feet. The witness Earnshaw indicates the location and dip of the back fissure from the Finn to the 800 level, and corroborates the testimony of the previous witness. Likewise as to other testimony for the defendant on this subject.

Speaking of the dip of the back fissure, the witness Akers said that from the workings in the mine he found the dip from the surface to the 300 level, to be "slightly to the west, approximately between 80° and vertical;" that from the 300 to the 600 level the dip of the foot wall is about 50° from the horizontal; and that from the 600 to the 800 level it had a dip of about 85° from the horizontal. The witness Earnshaw testified that the difference in elevation between the 800 and the Finn level is 688 feet; that where the back fissure crosses the Silveropolis south end line extended on the 800 level it is 135 feet westerly of the west side line of lot 38: and that on the Finn level, where the back fissure crosses the same end line, it is 92 feet west of that side line, the fissure being thus 43 feet further west on the 800 than on the Finn level, and consequently, as he says, in decending a vertical distance of 688 feet the distance between the two levels, the angle of dip was 86° 30′ from the horizontal. The testimony relating to the various levels and workings of the mines thus referred to is not materially different in character and import from the mass of testimony of numerous other witnesses for the defendant on the same subjects.

In turning to the testimony on the part of the plaintiff, to ascertain therefrom what facts and conditions are revealed by the underground workings, it will not be necessary to refer in the same detail to the tunnels, drifts, and other workings on the various levels, since much of the evidence already referred to is not controverted. Reference to the plaintiff's evidence, therefore, will be more general. Prof. Jenny, testifying for the plaintiff, says the vein or lode, "both in its outcrop at the surface and in depth, passes wholly on its strike out of lot 38," at a point on the west side line of that lot, about 87 feet southerly from the Silveropolis south end line

extended, and that the ore situated beneath the Silveropolis and Consort mining claims does not lie in any vein or lode having its apex in lot 38 north of that end line, but forms a part of a vein or lode having its apex within the surface boundaries of the Silveropolis and Consort claims. He also says the Betsy stope on the 300 level is not a part of the Mammoth vein, but "is in the back vein." Respecting the territory north of that end line extended and easterly of the line of stoping in direction of the line T-S, his testimony is to the effect that the developments on the different levels, from the Finn tunnel down to the 900 and below show that the workings are in barren material, except the back vein or fissure, which appears to fade out before it reaches the 1,100-foot line; that the various levels are driven mostly through broken, fissured, and ·shattered lime rocks, in places through brecciated and stained material, and the dykes; that on the Grand Central side the sedimentary beds are as much shattered and broken as on the side of the Mammoth, except where the breaks or dykes occur; and that the vein consists of a series of fissures, having its general course in the direction of the lines W-U, U-T, and T-S, and passes through the dykes northwesterly along the line U-T on its strike, passing through the Coates dykes between the 600 and 700 levels, and through the Finn dyke at the Bench stope. Speaking of the dykes between the 600 and the 700 levels the witness said: "The two dykes are just a short distance apart on these different levels, the junction being, as I explained, just at a point slightly south, never more than 100 feet south at any point, I think of the Silveropolis end line. The junction is almost vertical. On all the levels it is inclined, going to the west. It lies under the Silveropolis south end line practically, sometimes 100 feet to the south; then on the next level they will widen out, join under the line. It goes up to the roof of lime, with very little clay material arching it over." He also states that the "inclination of the vein is 75° in that northwesterly direction" along the line U-T, from the horizontal.

Dr. Talmage, testifying for plaintiff, corroborated the tes-

timony of Prof. Jenny, and speaking of the Finn tunnel, from station 03 north, he says: "As you go through that tunnel from its mouth to its face there are absolutely no indications of mineralization." And the witness also says that the country through which the 200 and 400 levels of the Grand Central are driven, from the shaft easterly to where ore is encountered, consists of broken, fissured, and fractured limestone, shattered as much as in any of the workings in either of the mines, except where such workings penetrate the dykes. He speaks likewise of the Grand Central 700 level from the shaft easterly; and according to his testimony the material is much the same in the long cross-cut at station 643 and the northern workings on the Mammoth 600 level, except where the dyke material is encountered. The witness, after testifying that the strike of the vein, from the south end line of lot 38, proceeding north, is in the direction of line W-U, about N. 7° W., true, to the point U, thence along the line U-T, N. 51° W., true, to the point T, thence in the direction of the line T-S, and that the boundaries of the vein "would be determined by the nature of the mineralized matter; and therefore by the limits of the ore bodies themselves, both on the sides and upward, and doubtless downward, if you went to the bottom of them," gave his reasons as follows: "My reasons are based upon the positions of the ore bodies. I followed them for great distances, from the south northerly, and have followed them on some of the levels from the northern part southerly, and I find them to be virtually as indicated here on the map. Coming from the Grand Central workings in the southerly direction, I find the ore bodies following a line which is approximately north and south. When I reach the point, or when I project the point indicated here as connection, near the letter T, as a designation of the line—of the line T-U—I find the ore bodies turning to the east and pursuing a southeasterly course until we reach the ore in the neighborhood or in the Cunningham stope, when another turn is observable and plainly apparent. The ore bodies then follow a course represented by the line W-U. Now, along that belt from the north to the south I

find those ore bodies confined within a limited area, not more than a hundred feet wide in general. In examining the several workings, running northerly—I mean to say from the line T-U—I fail to find any continuation of the great ore bodies. I make this answer independent of the consideration of outcrop, having already stated that after diligent search for an outcrop on lot 38 I have failed to find it; and beneath the ground I fail to find any vein to apex or to strike, and therefore I fail to find any apex or strike of a vein."

The witness Wilson says the 200, 400, 700, 900, and 1,100 levels of the Grand Central, from the shaft easterly, are driven through broken, shattered, and fissured limestone, and that, with the exception of the dykes, "there is a correspondence in what we see in passing through the drifts," on the Mammoth 300 level, "from station 36 out to their faces." He further testified: "Q. Have you been up the Condon winze through the works branching therefrom, and through the Condon tunnel, or what is marked on our map as Accident tunnel, to its easterly face? A. Yes, sir; I have been up in through those workings. From the easterly face westerly it is in limestone. This limestone is standing quite vertical." He also says the cross-cut on the 700 level, from station 739 to 72, in which connection is made between the mines, "is entirely unmineralized in its total length." The witness Tyler said that the limestone, through which the 200, 400, and 700 levels of the Grand Central are run from its shaft easterly, is as much broken and fractured as is the limestone in any of the northern workings in either of the mines, excepting the dykes, and that "the only portion of the Mammoth ground, of the cross-cuts in the Mammoth ground, that compare with the openings and fissured condition of the Grand Central 200 cross-cut, is a portion of the east 600 cross-cut of the Mammoth in the neighborhood of station 643, from that west to station 641. That is the triangle of ground between the two dykes and is very much fissured and broken." He also testified: "Q. Now, taking the vein in sections, subdividing it, what would you give as the strike of the various divisions? A. The average strike of the southerly

portion would be in the direction of the line W-U; of the middle portion of that crossing through the Bradley fraction would be in the direction of the line U-T; that from T northerly through the Butterfly stope would be in the line, I should judge, about N. 10° or 12° W." The testimony of other witnesses for plaintiff respecting the underground workings is of similar import.

Respecting the boundaries of the vein Col. Wall testified: "As shown by the excavations, the work had extended to the limit of the ore and into the rock at various points along, showing definite and easily understood boundaries; and these boundaries could be none other, or no better described, than the limit of the ore. Wherever replacement had ceased there it was simply limestone, within a few inches, and this seemed to be true everywhere. The stopes had been extended as far as profitable, and then here and there cuts driven out until barren limestone was encountered, and all this within a distance of a very few feet from a point at which stoping had ceased; that is, from which the ores had been removed. Q. Within a very few feet you come into barren lime? A. Everywhere." And he says the width of the ore through the Grand Central is irregular, 10 to 40 feet, "in places as much as 100 feet, or even a little more." Prof. Jenny says: "I consider the limit of the vein to be the limit of the mineralization." Dr. Talmage testified: "The boundaries of this ore body or vein throughout its entire extent in my opinion and judgment, would be determined by the nature of the mineralized matter, and therefore by the limits of the ore bodies themselves, both on the sides and upward, and doubtless downward, if you went to the bottom. I would consider the rock there mineralized in the sense in which we are using the term, as indicating ore matter when it carries valuable metals to an amount in excess of the valuable metals carried by the country rock. Q. I will ask you if, in your examination of the works of both mines, you are enabled to find else than the limit of mineralization that could be assumed as the boundary; in other words, if we were to cut loose from the mineralization, whether you could find anything as you trav-

eled easterly or westerly which could be taken as a limit of demarkation between the vein and the country rock? A. I know of no other boundary or limit that could possibly be set." The witness Loose testified: "Nowhere have I seen that [the ore] more than 50 feet or 100 feet wide." A number of other witnesses for the plaintiff testified to the same effect as to the limits of the vein.

The witness Jenny, speaking of the deposition of the ore in these mines by replacement, says: "In the heart of the ore bodies, where the ore was deposited at the very height of the ore-making period, where the solution and the action were most intense, we find chemically pure galena, fine grained in its structure as a piece of steel, exactly replacing the shape and form and size of the original limestone fragments; and if the stope be dusted over by the force of the explosion of shots in mining, so that it has a little dimmed the appearance of the ore, it is impossible by the eye to distinguish fragments of limestone which weigh only a few pounds from fragments of galena that you cannot lift. The rock has been converted without a change of form directly into the ore itself." There is much other testimony showing indications that the vein was formed by replacement.

The witness Brooks, after explaining the projections of the ore bodies of the Mammoth mine on the plane U-T, testified: "Q . Mr. Brooks, have you ascertained the vertical distance from the surface to the 1,900 level? A. Yes, sir; the vertical distance is 1,800 feet. Q. Have you taken the horizontal distance from the most easterly ore to the surface, and most westerly at 1,900, in the vicinity of the Mammoth shaft? A. Yes, sir; it is 100 feet from the most easterly point on the surface to the most westerly point of ore, as I surveyed it, on the 1,900. Q. Now, what is the angle of the dip? A. 86.45° from the horizontal." The witness Tyler says that, from the top of the winze on the 400 level of the Grand Central, where ore appears, to the ore cut by the plane K-K, on the 1,000 level, the westing of 95 feet is made, and that gives angle of dip, for the whole distance, of 82° from the horizontal. He also says that the vertical distance from the top of

the ore above the 600 level, just north of the 1,100-foot line, down to the ore on the 800, is 270 feet, and that the westing is 80 feet, giving, through that depth, an angle of 78° 30′ from the horizontal. Prof. Jenny says in the section along the line U-T the beds course N. 70° W., magnetic, exactly with the strike of the fissures, but that the dip of the fissure is 75° to 80° from the horizontal. Numerous other witnesses for the plaintiff gave similar testimony respecting the underground workings of these mines.

Respecting the faulting along the Finn dyke, the witness Akers stated that he should expect the faulting or interruption of the vein on its downward course was considerably over 50 feet, and possibly several hundred feet, and then said: "That is only an approximation, since the real truth as to the question of throw can never be determined. Q. If the hanging wall of the fault had gone upward, it would have been what kind of a fault? A. It would have been a reversed fault. O. If the hanging wall had gone downward, it would have been— A. Normal fault, sir; and I don't know which it did. I know it did one or the other. It either rose or sunk; but in either case that condition of affairs would be produced. We would have a dislocation either above or below." He also testified: "Q. If the dyke fault had taken place after the vein was formed, what would you have expected of the vien in the way of faulting? A. I would have expected that vein to have been cut off, and the two ends of the vein removed from each other, so that there would be no connection whatever between them." The witness Earnshaw, speaking of the dyke, said: "It could be called vein material," that it "was crushed and fissured before the vein was formed, and that "by the secondary movements on the fissuring it has been further crushed and ground up." The witness Jenny, speaking of the Finn break, said: "First in the movement the rocks were shattered and broken up into large pieces, many feet in dimensions, and lines of sheeting or fissuring parallel with the dyke made through the rocks and the material there adjacent to the fissure. Then, as the movement continued, these masses of rock were pulverized more

29 Utah—35

and more—more and more broken. It is very irregular in width, in some places only 15 feet wide, in other places it would expand to 30, 40, or 50 feet in width. Then, where it united with the Coates dyke on the south, it is possibly 120 to 125 feet wide. The dyke appears to have grown from its eastern side towards its western. On the eastern side, which would be its foot wall, we find a heavy, tough stratum of clay. That is [due to] the grinding movement of one wall moving upon the other." He also testified: "Q. Did you find any place else, excepting at the point along the line T-U, to the north, where the ore body goes through these dykes? A. I did not. To the south we find the great fault, which has aided in making the apex stope 100 to 150 feet wide."

Mr. Tyler, referring to faulting testified: "I think that there has been movement, along the line of the foot wall of the Finn break and on different parallel slips included within the Coates dyke, which has resulted in the dislocation of the ore body, in a dropping of the ore bodies lying west of the dykes, to a position anywhere up to 400 feet or so lower than that formerly occupied before the faulting took place." Speaking of the ore, slight in quantity, found in broken and shattered material near the southerly end of the drift running south along the dyke on the 400 level, at station 401i, and in explanation of the occurrence of ore there, the witness said: "I should judge it is merely another occurrence, on a very small scale, of what we find farther to the north in the stopes about the 500 and the little stoping about the 400 just north of this in the dyke; that is, in the part carried down from the ore bodies above." Speaking of ore found on the 500 level between stations 622 and 688b, the witness says: "This was a thin, comparatively thin, body or sheet of ore material, as far as I could find by passing up and down through the stopes, which lay within the fault or within the dyke, and to the west of the foot wall of the dyke; a sheet of ore in a tabular form, which lay along the dyke, partly as if it had been dragged there, and partly as if it was a mass of ore that had been carried down with the faulting and left there." Dr. Talmage, describing the oc-

currence of ore and condition of the dyke there, said: "I found evidence of low-grade ore. This occurs on the surface of fractured pieces of limestone. The foot wall of the dyke at station 401i is beautifully polished, giving evidence of movement producing typical slickensides. Further evidence of fault is in the brecciated condition extending westerly from the polished foot wall" of the dyke.

The foregoing statement, and extracts of the testimony, show the character of the evidence introduced at the trial in this case. The case was thus submitted to the court and jury with evidence relating to all parts of the properties, surface and underground, in the greatest detail, and, the jury returning a verdict upon the special issues in favor of the plaintiff, the court adopted the verdict, and found, agreeably with it, that the top or apex of the vein continued, from the southerly end line of the first northern extension of the Mammoth, lot 38, to the place where the Cunningham stope at its northerly edge or end crossed in its northwesterly course the west side line of that lot, such point or place being, as found, 690 feet north of such southerly end line, and 90 feet south of the southerly end line of the Silveropolis mining claim, extended easterly in its own direction across lot 38; that at that point the vein on its strike and at its apex wholly departs from lot 38, and does not continue within that lot between the planes drawn through the Silveropolis southerly end line so extended and the 1,100-foot line; that such apex does not continue north of such end line within the limits of lot 38; that between such planes, on that end line so extended and on the 1,100-foot line, there is no apex or part of an apex of any vein, lode, or ledge, which vein, lode, or ledge on its dip extends to and includes the ore bodies known to exist beneath the surface of the Silveropolis and Consort Mining claims, between those planes; and that the apex of the vein or lode which is in the south end of lot 38 does not continue in that lot north of the Silveropolis south end line extended. The decree is in harmony with these findings, and directs that the defendant's counterclaim be dismissed.

Notwithstanding this decision, which was substantially the

same as that at the previous trial, the judge filed, separate and apart from the findings and decree, a written opinion, in which he concluded that there are two veins in the Mammoth ground; the one running from the shaft north at least to the 1,700-foot line, and the other lying to the east. In this opinion he argued that the ore bodies in controversy belonged to a vein which had its apex in the Golden King and Bradley mining claims, and could be recovered by the defendant in a proper proceeding. Thereafter the defendant asked leave to amend its counterclaim, and later to file an original counterclaim, in accordance with the expressed views of the court. These requests being refused, the defendant prosecuted its appeal.

This record presents two principal questions for determination: First. Whether the court erred in finding that the vein mentioned in the counterclaim upon which the trial was had, at its apex and on its strike, leaves lot 38 at a point 690 feet north of the south end line of that lot. Second. Whether the court erred in refusing to permit the defendant to file the amendment to its counterclaim, and in refusing to permit the filing of its proposed original counterclaim, in each of which it was alleged that the vein found at the south end of lot 38 did, at its apex and on its strike, wholly depart from that lot at the point found by the court, and that its apex beyond that point was in the Golden King and Bradley mining claims. All other questions presented are subordinate to and in support of one or the other of these two.

BARTCH, C. J., after stating the case as above, delivered the opinion of the court.

The main question, which resulted from the issues raised by the pleadings that formed the basis of inquiry and submission at the trial and which we will consider in the first instance, is whether the court erred in finding that the vein or lode mentioned in those pleadings, at its apex and on its northwesterly course or strike, crosses the western side line of lot 38 and wholly departs from that lot at a point 690 feet north of its south end line, and north of that point does not

continue, either at its apex or on its strike to or beyond the 1,100-foot line within the limits of lot 38, and that there is no vein or lode having an apex or any part thereof within the limits of lot 38 north of the southerly end line of the Silveropolis mining claim extended eastward in its own direction, and south of the 1,100-foot line, which on its dip extends to and includes any of the ore bodies existing underneath the surface of the Silveropolis and Consort mining claims south of the 1,100-foot line. This is principally a question of fact, and must be considered in view of the law of Congress respecting extralateral rights. It includes various incidental questions of importance. For its solution and determination we have volumes of testimony of men of science, of engineers, and of practical miners, concerning the location and workings of both mines, surface and underground. Men distinguished for their scientific attainments have testified not only as to the existing physical facts, but have explained how, in their opinions, by the processes of nature, the mineral was deposited where it is found, making reference in detail to the facts and physical appearances which controlled their judgments. Upon careful study of the geological facts in evidence, involving so many and such varied features, one cannot marvel that these witnesses differ in their conclusions. Aside from some statements of a few witnesses whose judgments were either faulty through want of comprehension, or warped by interest, the testimony is such as inspires confidence and warrants serious consideration. The case was prepared with a commendable degree of care and tried by eminent counsel on both sides. The maps and glass model, the researches made in the mines by witnesses for the purpose of unfolding the intricacies of nature respecting the formation and character of veins and deposition of ore, all bespeak a degree of professional skill and ingenuity commensurate with the magnitude of the interests involved. The premises are of very great value. It would be idle to say that upon the result of the case made by the counterclaim and answer depends but the ownership of the ore bodies in the Silveropolis and Consort mining claims

south of the 1,100-foot line. It is plain to be seen, without demonstration, that, if the ore bodies in dispute herein are embraced in a vein having its apex in lot 38 north of the Silveropolis south end line extended, the ore bodies north of the 1,100-foot line in the same claims are parts of and belong to the same vein. The ultimate question involved is therefore not merely the ownership of a few ore bodies of the alleged value of $300,000, but the ownership of ore bodies or of a vein of ore doubtless worth several millions of dollars. That such inevitable results would follow in the wake of this trial and decision was, without doubt, fully understood by both sides, as is evidenced by the exhaustive manner in which the case was tried. It will be thus observed that the question here under consideration is one of vast importance and susceptible of grave consequences to the litigants, and is entitled to receive our closest scrutiny and most careful and deliberate judgment.

In determining this question the surface of lot 38, the extralateral rights of that lot, the dip and strike of the vein, and the underground workings of the mines are important factors. The extralateral rights, upon which the appellant has founded its claim to the ore bodies in dispute, accrued to it as owner of lot 38 by virtue of the provisions of section 2322 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 1425], whereby the owner of a mining claim has a right to follow, between vertical planes drawn downward through the end lines of the location, a vein having its apex within the limits of such claim on its dip to the deep, although such vein may so far depart from a perpendicular in its course downward as to extend outside of the vertical side lines of the surface location. The ore bodies in controversy, however, being located without the limits of lot 38, and underneath the surface of the Silveropolis and Consort mining claims, the appellant, notwithstanding the law of Congress, is met at the very threshold with the presumption that they belong to the respondent, the owner of those claims. Where a person, natural or artificial, owns a patented mining claim, although the statute reserves the right to locators of

other mining claims to follow their veins under its surface and extract ore, he is presumed to own all the ore within planes drawn vertically downward to the deep through the boundary lines of such claim, as well as the surface and everything else appurtenant to the claim; and such presumption continues until some other locator or owner establishes the fact that he is entitled to exercise the reserved rights by virtue of the statute.

"Within the lines of each location the owner shall be regarded as having full right to all that may be found, until some one can show a clear title to it as a part of some lode or vein having its top and apex in other territory. To state the proposition in other words, we may say that there is a presumption of ownership in every locator as to the territory covered by his location, and within his own lines he shall be regarded as the owner of all valuable deposits, until some one shall show by preponderance of testimony that such deposits belong to another lode having its top and apex elswhere." (*Leadville Min. Co. v. Fitzgerald*, 4 Mor. Min. Rep. 38; *Con. Wyo. Gold Min. Co. v. Champion Min. Co.* [C. C.], 63 Fed. 540; *Doe v. Waterloo Min. Co.* [C. C.], 54 Fed. 935; 1 Snyder on Mines, secs. 766, 783, 789.)

To overthrow this presumption and establish its right to enter its neighbor's ground to extract ore, the burden of proof was upon the defendant, and it was incumbent upon it to show, by a preponderance of the evidence, not only that the apex and strike of the vein were in lot 38, north of the south end line of the Silveropolis mining claim extended, and to the 1,100-foot line, but also to show that, between planes drawn vertically downward through that end line and the 1,100-foot line, the vein from its apex on its dip was continuous; that its continuity extended to and through respondent's ground; and that the ore bodies in question formed a part of the vein. In other words, the burden was upon the

appellant to show by a preponderance of the evidence whatever was necessary to bring it within the terms of the statute, in order to entitle it to the disputed ore bodies, or to justify it in the extraction of ore from its neighbor's ground. (*Doe v. Waterloo Min. Co.,* supra; *Leadville Min. Co. v. Fitzgerald,* supra; *Penn. Con. Min. Co. v. G. V. Expel. Co.* [C. C.], 117 Fed. 509; *Con. Wyo. Gold Min. Co. v. Champion Min. Co.,* supra; *Mining Co. v. Campbell,* 17 Colo. 267, 29 Pac. 513.)

We concede, as claimed by the appellant, that a patent to a mining claim raises a conclusive presumption that there is the apex of a vein within the patented ground (1 Lindley on Mines, sec. 305); but there is no presumption that it is the apex of the vein in dispute, and such presumption applies equally to the Silveropolis and Consort mining claims as to lot 38, and does not shift the burden of proof in this case as to the apex and continuity of the vein and ore in controversy. The appellant, however, insists that the evidence clearly establishes that the apex and strike of the disputed vein do in fact continue in lot 38 to and beyond the 1,100-foot line, that the vein is persistent in its continuity on its dip to the ore bodies in question, that such ore bodies constitute a part of the vein, and that the court erred in its findings, *inter alia,* that the vein, at its apex and on its strike, wholly departed from lot 38 at the point designated, on a northwest course, because, as is claimed, the evidence is insufficient to sustain such findings. In reply to this contention, the respondent insists that as to whether the vein, claimed to include the ore bodies, at its apex and on its strike continues in lot 38 to and beyond the 1,100-foot line, or whether it departs wholly from that lot, on its strike, at the point found by the court, the evidence is conflicting, and invokes the rule, long firmly established within this jurisdiction, that where in a case in equity there is a substantial conflict in the evidence this court will not disturb the findings, unless they are so manifestly erroneous as to demonstrate some oversight or mistake which affects the substantial rights of the appellant. The appellant, however, claims there is no such conflict in the evidence as to

warrant the application of the rule in this instance; that the disagreement is not as to the physical facts, but in conclusions drawn from those facts, by the various witnesses, as to what kind of mineral or earthy matter constitutes an apex. Whether the conflict in the testimony of the witnesses relates to their conclusions alone, or to their conclusions and physical facts, or whether it amounts merely to a difference in the opinions of witnesses as to meaning of words—the meaning of "apex" or definition of "vein"—must, so far as possible, be ascertained by reference to the evidence.

Respecting the geological features of the country in which the properties are located, there is practically no conflict. It is shown that the mines are found in a lime belt which covers about two square miles, and is the great producing area of the Tintic district. In some places the limestone beds are upturned, large areas tilted upon edge, the beds dipping nearly vertically down; while in other places they dip at lower angles, and in special areas the dips are quite uniform; and again, though, it seems, not frequently, anticlinals exist. This limestone is surrounded on all sides, except the north, by igneous rocks. The sedimentary rocks are broken up and fractured, evidently the result of igneous intrusion. The limestone carries some iron, the different forms of iron oxide, also some manganese, and in places the limestone is crushed, crumbled, and brecciated. How these beds of organic sediment were dislocated, bent, and upturned is not free from doubt. Maybe, and most likely, these things were accomplished by some kind of volcanic action, which igneous intrusion indicates, and much fracturing may have been caused by internal shrinkage through nature's cooling processes. Whatever the cause, the disturbance is apparent from the evidence. The surface of the limestone area, wherever exposed, is marked with innumerable seams, cracks, and small fissures filled with carbonate of lime, stained more or less with iron, and sometimes manganese. Quartz, spar, and other materials, characteristic, in general, of mineral-bearing limestone areas, are present, and in places the surface material is brecciated and recemented. A trace of minerals, of one or more of the preci-

ous metals, and, in places, more than a trace, even where there is no known vein, seems also to be a characteristic of that lime belt. The witnesses for the appellant, who had examined the surface and open cuts, as well as the underground workings of the mines, testified, in general, that the fractured, stained, and brecciated conditions appeared to such an extent upon the surface and in the open cuts of lot 38 as to furnish unmistakable evidence of the apex of a vein; that the vein was so clearly defined upon the surface, and so distinctly differentiated from the adjacent country, that its boundaries could readily be traced throughout the length of that lot and be recognized by mere observation; and that the indications showed the apex to be so wide that it overlapped the side lines of that claim.

The leading witness for the defendant, Mr. Akers, an expert of much scientific knowledge, after testifying that the Mammoth was a fissure vein, and that it was not an individual fissure, but consisted of a series or many approximately parallel fissures, or breaks, in the mountain fractures, said: "Taking this individual vein, this broad, beautifully defined fissure, that I personally have traced for a distance of between 3,000 and 4,000 feet on the surface, we find that it is clearly defined on the surface, and so clearly and distinctly differentiated from the adjacent country that I could identify all points generally along the course of that vein. I could stand at one end and, as far as the configuration or topography of the country permitted, see how that vein ran; and to guide me in the other direction, namely, the southerly, a portion of the ground not in controversy at all, I could see the vein there through extensive workings for say 1,000 or 2,000 feet." And then, after referring to the condition of the vein, the deposition of the ore by replacement or metasomatic change, the eroding of the surface, and to geological events which, he says, transpired in the making of the vein, claiming that the first great dynamic disturbance was the crushing that resulted in the formation of the Finn dyke, and that the second great disturbance, or convulsion, consisted of the fracturing of the great mass of

rock that constitutes the Mammoth vein, the witness describes the open cuts and says Grand Central cut 2 "shows stained rock." Of tunnel B he says the easterly cross-cut is in vein material, and where it encounters the northerly and southerly drifts a streak of vein appears, and that the drifts do not disclose the full size of the ore streak. The "pit," he states, "shows iron, manganese, and rhodochrosite," cuts 4a and 4b show "shattered lime," and according to his testimony and that of the defendant's witnesses generally, cuts 6 to 15 and the other cuts north of the Silveropolis south end line extended, show some dyke material, some shattered and stained limestone, and others broken and fractured matter, stained with iron or manganese, in some places, of a brecciated character, containing seams, calcite, and calcarious cement. In other words, they claim the material of the various open cuts is such as to show an unmistakable outcropping of the vein.

While the defendant's witnesses are emphatic in asserting an apex in lot 38, and clearly defined differentiation of the surface of that lot from the adjacent country, none of them attempted to locate upon the surface or fix the hanging or foot wall of the vein, north of the Silveropolis south end line extended, nor north of the point at the Cunningham stope, where the court found the vein departed from the lot; and yet, if its differentiation be so clear that, "to recognize its boundaries," one, as claimed by Mr. Akers, need but look at the surface, aside from the open cuts, the query naturally and logically arises why, in a controversy of this magnitude, its vital and decisive point the apex of the vein, its boundaries were not traced and definitely fixed within the disputed territory. Why was such a point, where such immense interests are involved, and where counsel distinguished for ability were searching every nook, every avenue, for facts favorable to their cause, left to mere conjecture, to mere inferences from disputable surface appearances? The only answer which this voluminous record affords comes from the witnesses for the plaintiff, and that answer has the support of the findings of the court. These witnesses, after looking at the same open cuts and tunnels, observing the material exposed, and

after examining the same surface and the surface east and west of lot 38, some of them claiming to be familiar with practically the whole surface area of the lime belt, say with at least equal emphasis that no such differentiation exists; that there are no indications of a vein or apex on lot 38 north of the point where the Cunningham stope crosses its west side line, which is about 90 feet south of the Silveropolis south end line extended; that, apart from the dyke material, the limestone north of that point within lot 38 is not any more broken and brecciated than in the adjoining country to the east and west; that neither the calcite, the calcspar, the iron seams, the iron stains, nor the fracturing or fissuring is any more abundant within the limits of that lot north of that point than for a long distance to the eastward and westward; that wherever, in that belt, the surface of the rock is exposed, by erosion or otherwise, there appear innumerable seams, cracks, small fractures, or fissures, running in every conceivable direction, filled with calcite, stained more or less with iron, in instances containing some manganese; and that in many places the surface material is brecciated and recemented.

Dr. Talmage, a geologist and expert of eminent ability, who made his first examination of that section of country about 1884, and knew the surface boundaries of lot 38, upon further special examination of the open cuts and surface of that lot and of the country adjacent for the purposes of the trial, testified that there was "no surface evidence of an outcrop of a vein well defined farther north," on lot 38, than "incline No. 1, just north of the Gulf stope," and, after describing the open cuts and conditions on that lot and stating that the rock exposed in tunnel B was was country limestone with cracks and fissures filled with calcspar stained with iron and manganese, he said: "From one end of the limestone area to the other I have failed to find any part of it where the limestone is exposed, that such conditions are not to be found." Mr. Tyler, also an expert of undoubted ability and of extended experience, after thorough examination of both properties, said that, outside of the dykes, the surface indications on lot 38,

north of the Silveropolis south end line extended, were like those east and west of that lot, and that he found the same indications "westerly to the slopes of Eureka Peak," distant 2,500 feet, "about in the northwest corner of the King William claim."

The evidence also shows that numerous samples were taken from the various open cuts and exposures, but, with few exceptions, the assays of those samples, taken north of the Silveropolis south end line extended, revealed either nothing or but a trace in any of the precious metals, and the few exceptions yielded little more than a trace—simply such results as may be obtained, at least according to the evidence of the plaintiff, in many portions of that limestone country where no vein exists, or beyond the limits of any vein. An examination of the evidence discloses the fact that the witnesses on one side differ widely from those on the other in their statements respecting an apex at the surface in lot 38 north of the Cunningham stope, and in numerous instances as to facts and appearances. Such examination shows not merely a conflict, but that the question whether or not the surface, north of the point mentioned, discloses an apex of a vein in that lot, is answered in the negative by a preponderance of the proof on the subject. It is quite clear that the findings of the court have strong support in the testimony relating to the surface.

Do, then the underground workings and explorations reveal the existence of a vein, which has an apex within the limits of lot 38, from the Silveropolis south end line extended north to the 1,100-foot line or beyond, and which on its dip extends to and embraces the ore bodies in dispute? Or does the vein, which, as found by the court and admitted by the parties, crosses the south end line of lot 38 and continues northerly, within the limits of that lot, to a point 690 feet from that end line, continue thence northerly parallel with the western side line of that lot, or at that point change its course or strike to and thence continue in a northwesterly course in the direction of the lines U-T and T-S, and embrace on its dip those ore bodies? On this subject the contention

of the appellant is that the sub-surface explorations show that the vein at the surface is a unit, and that its apex is in lot 38, not only at the southern end of the lot, but continues therein, on its strike, to and beyond the 1,100-foot line; that, on its dip it divides, the one, the easterly branch, going almost vertically to the deep, and the other, on its westerly dip, embracing the ore bodies in question; that the vein, through the disputed territory from the upper levels down to the lower levels, is shown on each level, and by connections from each level to the level above and below, all in the undisputed portions of the vein; and that the extent of the vein, in width, is determined by the limits of the broken, fractured and stained condition of the sedimentary beds. The contention of the respondent is that the underground workings show that the vein departs from lot 38, in a northwesterly direction, at the Cunningham stope, as found by the court; that this is a vein formed by replacement; and that, therefore, the limits of mineralization determine the limits of the vein.

In deciding these contentions, it behooves us to look at the formations—the geological facts which, the proof shows, the development of the mines has brought to view—and see where such facts place the northerly portion of the vein, at its apex, on its strike, and on its dip, which admittedly exists in the southerly end of lot 38. Mr. Akers says the Condon tunnel contains the highest underground workings on the properties, the tunnel itself being driven through country limestone to the dyke; that the entire cross-cut is in shattered, broken, stained, and altered vein material; and that the Condon winze down to the Finn level, and the O'Brien winze to the 300 or Mammoth tunnel level, are in the same material. These are the winzes through which the appellant claims to trace the vein on its dip to the 300 level, and thence down through other works to the lower levels; but it must be remembered that the appellant's witnesses regard broken and fractured limestone, and any kind of stained and brecciated matter, as vein material, regardless of value in metal. From an examination of the diagrams in the statement of the case, and evidence of these witnesses referred to, it will be seen

that the workings on the Finn, the Plumber, and Mammoth tunnels, north of the Silveropolis south end line extended, are in the same kind of material; that the main drift on each level runs along the foot wall of the Finn dyke, and no ore, in any considerable quantity, has ever been found on any of those levels in those northern workings, not even on the 300 level north of the Bush winze at the north end of the Betsy stope, in which winze, between the 300 and 400 levels, about 60 feet above the 400, the appellant claims it is shown that the vein branches on its dip, the smaller and easterly portion going almost vertically to the deep, and the major portion passing through the dyke to the westward, although south of the winze there is ore.

Speaking of the cross-cut in the Finn tunnel, Mr. Learned says, from station 03, where it leaves the main tunnel, westerly through 021, 21, and 22, to its face, it is in broken lime, and that "broken lime is generally vein lime in that mine;" and this kind of vein material, with occasional dyke, brecciated, and stained matter unmineralized in the sense of the federal statutes, is substantially all that is claimed by these witnesses to appear in the drifts, cross-cuts, and branches driven in that northern territory, on the Plummer, the 300, and, in fact, the lower, levels of the Mammoth, and likewise as to the drifts, branches, and cross-cuts on the various levels of the Grand Central, both east and west of the line of stoping or ore channel. It is true, Mr. Akers says the Plummer tunnel is in vein and ore at the south end, and to its north end shows ore in places, shattered lime, and vein matter; but he does not identify the places, if any, where ore appears to the north end, and north of the East raise stope the tunnel runs along the foot wall of the dyke, which is not mineralized, except in the vicinity where the main vein passes through it. The statement, therefore, does not justify an inference that ore occurs on that level north of that stope. That it occurs south thereof, and is in the main vein, is admitted. He also says that the cross-cut of the Finn tunnel level is "within view, and within a few feet of it ore might be disclosed;" but, if such be the case,

it is difficult to understand, and no explanation appears in the record at all satisfactory, why those few feet, when, as shown, so much work was done by the appellant for the purposes of this case, in the hope of finding evidences of ore to establish the existence of a vein through that ground, were not driven and the ore disclosed. The witness, it seems, was unable to locate the boundaries of the west branch of the vein, where, it is claimed, it passed through the dyke to the westward, although he thought its foot wall was near station 107 on the 300, or near the western limits of the dyke.

The Mammoth workings on the 400 level extend north only to within about 50 feet of the 1,100-foot line, and Mr. Akers says the "dyke and the vein" are "closely intermixed." No ore is shown north of the Silveropolis south end line extended, except in the vicinity of and southward from the Betsy stope, which, according to the testimony of Mr. Akers and other witnesses, is in the east branch of the vein. The Bush winze extends to this level at the north end of that stope, and is within the same branch of the vein. Between stations 101 and 103, a winze goes down to the old stope above the 500 level, and the Hatton raise extends to the 500. Between the 400 and 300 levels is the 80-foot level, which appears to be in ore, as also the Bucket raise down to the 400 at or near the north end of the Betsy stope. The points clustering near the north end of that stope are of interest and will be adverted to later herein. Some of them are openings through which witnesses of appellant claim they have traced the dip of the vein, from the Finn tunnel down to the 500 and lower levels, and there is evidence that the Betsy stope connects in ore with the large stopes to the south, where the main vein is admitted to exist. Mr. Akers claims that on the 400 level, 45 feet north of the south end line of the Golden King claim, the vein "forks; one portion continuing approximately in the direction of the main vein, and the other diverging more to the northwest." Assuming this to be correct, it follows that the one branch courses in the direction of the Betsy stope, and the other in the direction of the point where the vein is claimed to pass through the dyke, and that each fork must

pass in its own direction on its strike.' The witness says, on the Grand Central side, the workings on this level are mainly above the vein but admits that at station 17 there is vein matter, and at station 15 a winze with ore at the top going to the Butterfly stope vertically into ore on the 600 level. He discovered no foot wall on the 400, but says he found the hanging wall east of station X. On the 500 level the main drift is on the east side of the dyke, and from station 543 northerly follows its foot wall. From the workings disclosed by appellant's evidence, it appears that the mineralization decreases, and the ore practically fades out, within a short distance either north or south'from the ore bodies which would be cut by a plane drawn vertically down through the Silveropolis south end line extended. The drift running northwest from station 537 is in limestone very little shattered. On this level the top of the Butterfly stope of respondent's mine appears.

The workings on the 600 level also present the appearance of ore fading out as one proceeds north or south from the main ore bodies. The Earl raise extends up to the 500, and the stope on this 600 level represents an immense ore body extending down to the 800 level, and is one of the ore bodies and part of the vein in dispute. Mr. Akers says in his opinion the back vein or fissure is a "stringer or dropper" from the main vein; that the vein consists of a series of fractures, having a course generally of N. about 20° E. in the upper portions and that the great ore bodies and vein on this level, clear down to the 800, are in a vein having an apex within and on either side of the side lines of lot 38, although he admits the distance, on an incline from the west side line of that lot to the ore of the Grand Central on the 600, would be about 1,500 feet. When we come to consider the dip of the vein, as it appears in evidence, it will be seen that this position of the witness is involved in difficulty. The west cross-cut from station 49, he says, has reached the vein in Silveropolis ground, and the east cross-cut from station 643 is through blocky lime for 468 feet, and here, he says, encounters an independent vein, while Mr. McIntire says the west cross-

29 Utah—36

cut from that station is in vein material. In fact, according to the appellant's witnesses, the northern Mammoth workings on the various levels are generally, as has been seen, in what they call vein material, consisting of fractured, seamed, and stained limestone, with occasional brecciated matter in places recemented. Mr. Akers states he had not found the foot wall on this level, but thinks it is about 20 feet east of station 643, and that the hanging wall is at or near station 5 of the Grand Central 600 level. Looking at the 700 level, the workings are extensive, much ore having been extracted from the Grand Central, but not much from the Mammoth ground, north of the Silveropolis south end line extended, except in the Bradley triangle at the Bradley-Consort line. The cross-cut, where connection between the two mines is made, is 600 feet long, and Mr. Akers says it runs through dyke and fractured lime; Mr. McIntire, that it is barren rock throughout. Connection is also made near station 7 at the Bradley-Consort line in the main drift. Mr. Akers admits that he has not found the foot wall on this level, but thinks the hanging wall is about 30 feet west of station 9 in the main Grand Central cross-cut. There are two branches of the dyke on this level. They diverge going north, as on the levels above and below. Mr. Akers also states that the vein in the Grand Central ground has a course N. 15° to 20° W., and is in ore from the cross-cut between stations 15 and 16 back to the Bradley-Consort line, a distance, he says, of 1,110 feet; and the testimony of Mr. Learned shows not only that, from north of the Silveropolis north end line, about station 15, the ore is practically continuous for the distance of about 1,100 feet, to near the Bradley-Consort line, but that from there the ore bodies change their course and continue about 300 feet further in a southeasterly direction.

On the 800 level the Tranter drift connects the two mines. The foot wall of the vein has not been located, but Mr. Akers thought he found the hanging wall 20 feet northwest of station 24 in the King William claim, and that there the vein passed "out of working to the northeast." Reference to the evidence of the appellant in detail respecting lower levels is

not deemed necessary here, because the conditions appearing on the 700 and 800 levels are not, so far as the developments show, materially different from those on the 900 and below, and it is clear, beyond question, that the vein, which embraces the ore in the disputed territory on the 700 and 800 levels, or that from the Grand Central 400 down to the 800, also includes that on the 900 and down as far as the developments extend, within such territory, and to the deep. Speaking of the boundaries of the vein, Mr. Akers said they extended, at least, to the limits of fracturing; and Mr. Watson said, "If the fissuring were all connected" and "extended 4,000 feet," he would say the vein extended that far, but he could not determine from the developments on any level where the foot wall was. This last is an extreme view of what constitutes a vein, as also is that of Mr. McIntire, where he states that if, on the 700 level, a cross-cut were driven through barren limestone all the way from M, a point at the northerly workings of the Grand Central, easterly to M-4, a point at the eastern limit of the vein, as fixed by him, distance 1,050 feet, and ore bodies appeared at M and M-4, he would conclude that they were in the same vein. Mr. Akers expressed the general view of appellant's witnesses upon this subject.

Respecting the back fissure, Mr. McIntire, speaking of the 800 level, says, from station A, near the Silveropolis south end line extended, through stations 153, 155, and 157, to the 1,100-foot line, it is called the "back fissure." So ores he claims to occur east of station 33, at a raise and in a drift, thence to the 1,100-foot line, on the 700, and at station 40 to that line on the 600, and in a drift running through stations 80, past raise on Silveropolis south end line extended, 81, 82, 583, to 542, are all in the back fissure. He says on the 400 level the back fissure extends from the raise north of station 92, thence north through stations "a," "b," "c," and "d" to the face, and thence on through station 99, being, where it crosses the Silveropolis south end line extended, 90 feet west of the west side line of lot 38, and that, on the 300 level, the main drift, run across that south end line through stations 9

to 17, and on through 109 and 22 across the 1,100-foot line, is in the back fissure through Betsy stope, and that the fissure is 10 to 15 feet west of where the drift crosses the end line; the witness at the same time stating that the Betsy stope was extended to the 800 level since this suit was commenced, but was extended down to the 400 and below a good many years ago. He also says the drift on the Plummer through the O'Brien winze, and the one on the Finn level, running northerly from station 03, across the same end line, stations 05 to 09, and the O'Brien winze to the 1,100-foot line, are in the back fissure, and the latter in low-grade ore practically all the way. On each of these last two levels the distance from where the back fissure crosses the end line mentioned to the west side line of lot 38 is 90 feet. Speaking of the dip of this fissure the witness Akers says, from the surface to the 300 level he found it to be "approximately between 80° and vertical," from the 300 to the 600 about 50° from the horizontal, and from the 600 to the 800 about 85° from the horizontal. Mr. Earnshaw says the difference in elevation between the 800 and the Finn level is 688 feet; that the point where the fissure crosses that end line extended on the 800 is 135 feet westerly of the west side line of lot 38; that point of crossing on the Finn level is 92 feet west of that side line, making a westing of 43 feet; and that the angle of dip is 86° 30′ from the horizontal.

The evidence to which reference has thus been made is believed to be fairly characteristic of the vast amount of proof on the part of the appellant respecting the underground workings, and from this review of the proof it may be seen that wherever the workings may extend, whatever material the witnesses may claim to have found in them exposed, whatever streaks of vein and vein material may have been disclosed, the fact stands out clear that the ore is always found near the line of the great ore bodies, whether they be on the strike or on the dip of the vein, northwesterly beyond the Cunningham stope—a question yet to be determined. Upon such review and an exhaustive examination of this voluminous testimony, it must be admitted that the boundaries of the vein,

an apex in lot 38 north of the north end of the Cunningham stope, a strike and dip that would carry the vein to and include the disputed ore bodies, have, to say the least, been permitted to remain in doubt and obscurity, and this, notwithstanding that the mountain to the north has been literally punctured, on each level, with drifts and cross-cuts, raises and winzes, in search for ore material that would establish the existence of such a vein north of that point.

Before referring to the testimony on the other side, it may be observed that the witnesses for the respondent do not differ from those of the appellant as to the existence and character of the vein in the south end of lot 38 to the north end of the Cunningham stope, the location and character of the ore bodies in dispute, including the Butterfly and Betsy stopes, the existence and location of the dykes, nor as to the workings on each level; but they are not always in harmony as to what the workings on the different levels disclose. .

Prof. Jenny, a scientific expert of much experience, says the vein or lode, "both in its outcrop at the surface and in depth, passes wholly on its strike out of lot 38" at a point, on the west side line of the lot, about 87 feet southerly from the Silveropolis south end line extended, and that the ore situated beneath the Silveropolis and Consort mining claims forms a part of a vein or lode having its apex within the surface boundaries of those claims, and that the Betsy stope is in a part of the back fissure. Respecting the territory north of the end line mentioned, and easterly of the line T-S, his testimony is to the effect that the developments on each level, from the Finn tunnel down to the 900 level, and below, show that the workings in those northern parts are in barren material, except the back vein or fissure, which appears to practically fade out before it reaches the 1,100-foot line; that the various levels, in that section, are driven mostly through broken and fissured lime rocks, in places through brecciated material and the dykes; that, on the Grand Central side, the sedimentary beds are as much broken, stained, and fractured as on the side of the Mammoth, except where the dykes occur; that the vein consists of a series of fissures, has its general

course in the direction of the line W-U, U-T, and T-S, and passes through the dykes northwesterly along the line U-T on its strike, through the Coates dyke between the 600 and 700 levels, and through the Finn at the Bench stope; that the dykes, and their junction, between those levels, are almost vertically beneath the south end line of the Silveropolis claim and their dip westerly 75° to 80° from the horizontal; and that the "inclination of the vein is 75° from the horizontal, in that northwesterly direction" along the line U-T. He considers the limit of the vein to be the limit of mineralization." Speaking of the Finn tunnel, Dr. Talmage says that, "as you go through that tunnel from its mouth to its face, there are absolutely no indications of mineralization," and, referring to the 200 and 400 levels of the Grand Central, that they are driven from the shaft easterly to where ore is encountered, through broken, fissured, and fractured limestone, shattered as much as in any of the workings of either of the mines, except where they penetrate the dykes. He speaks likewise of the 700 level from that shaft easterly, and says the material in the long cross-cut at station 643 and in the northern workings on the Mammoth 600 level is much the same, except the dyke. He states that the strike of the vein, from the south end line of lot 38, is in the direction of the line W-U, about N. 7° W., true, to the point U, thence along the line U-T, N. 51° W., true, to the point T, thence in the direction of the line T-S, and the boundaries of the vein "would be determined by the nature of the mineralized matter, and therefore by the limits of the ore bodies themselves, both on the sides and upwards, and doubtless downwards, if you went to the bottom of them," and says, along the lines indicated, the ore bodies in general are not more than 100 feet wide, and that from the line U-T northerly he failed to find in the workings any continuation of the great ore bodies. Mr. Wilson says the 200, 400, 700, 900, and 1,100 levels of the Grand Central, from the shaft easterly, are driven through broken, shattered, and fissured limestone, and that, with the exception of the dykes, "there is a correspondence in what we see in passing through the drifts" on the Mammoth tunnel level

"from station 36 out to their faces." He states that the Condon winze and the workings therefrom are in limestone and stained material, but not connected with a vein or ore, and that the cross-cut on the 700 level, from station 739 to 72, in which connection is made between the mines, "is entirely unmineralized in its total length."

The foregoing testimony is fully corroborated by that of other witnesses for the respondent. In fact the proof of the respondent in general shows that, apart from the ore bodies or ore channel and dykes, the limestone, as revealed by the workings, is as much broken, stained, fractured, and fissured on the Grand Central side as on that of the Mammoth, and that the developments on the various levels north of the ore bodies along the line U-T, and east of those along the line T-S, disclose no more mineralization than may be found in places all over that limestone country. Mr. Tyler says the east 600 cross-cut of the Mammoth, from station 643 to 641, which is in the triangle between the dykes and very much fissured and broken, is the only portion of the cross-cuts in the Mammoth ground that compares with the openings and condition of the Grand Central 200 cross-cut. Speaking of the boundaries of the vein, Col. Wall, an expert quite familiar with the formations in the region of these mines, says they are the limits of the ore; that, as shown by the workings, limestone appears everywhere within a few inches or feet of the ore; and that the width of the ore through the Grand Central is irregular, 10 to 40 feet, "in places as much as 100 feet, or even a little more." The testimony of the respondent is clear that the vein was formed by replacement or metasomatic action, and the leading witness for the appellant admits that to some extent it was so formed. Mr. Brooks says the vertical distance from the surface to the 1,900 level is 1,800 feet and the angle of dip over 86° from the horizontal. Mr. Tyler says that from the top of the winze on the 400 level of the Grand Central, where ore appears, to the ore cut by the plane K-K on the 1,000 level, the westing of 95 feet is made, giving an angle of dip of 82° from the horizontal, and that the angle of dip from the top of the ore

above the 600, just north of the 1,100-foot line, down to the 800 level, is 78° 30′ from the horizontal. Prof. Jenny says in the section along the line U-T the beds course N. 70° W., magnetic, exactly with the strike of the fissures, and that the dip of the fissures is 75° to 80° from the horizontal.

In addition to the great mass of testimony of both parties respecting the underground explorations in these mines, it is shown that very numerous samples were taken from the material found in the drifts, cross-cuts, and workings, on the various levels, north of the Silveropolis south end line extended; but, excepting those from the vicinity of the back fissure and the line of stoping or ore channel, the assays in evidence, like those from the surface samples, indicate no mineralization not common generally throughout that limestone area. The evidence on both sides relating to the surface and to the underground explorations, to which reference has been made, is deemed to fairly show the conditions and geological facts of those portions of the properties which will be affected, either directly or consequentially by this decision, and also of those portions, not affected by the result hereof, which have an important bearing upon what is involved. There is a mass of testimony, however, relating to ground and objects of some importance, which has been given due consideration, but to which specific reference is impracticable.

It is apparent from the testimony referred to, as well as from all the evidence, that there is, to say the least, some conflict, not only as to the conclusions of the witnesses drawn from the physical facts, but as to the facts themselves—as to what things actually exist and may be seen upon the surface and in the mines. As instances: The witnesses for the appellant, looking at the open cuts, say vein material is exposed; the witnesses for the respondent, looking at the same cuts, say country rock. The former say the broken, stained, and fractured rock is peculiar to lot 38, and shows the outcropping of a vein; the latter, that such rock is found everywhere in the lime belt, wherever exposed by erosion or otherwise. The former say the occasional breccia, the calcite seams, and

stains of iron and manganese are characteristics of lot 38, where they claim the apex is; the latter say they are characteristics of the whole limestone area. So the former, looking at the formation, on the various levels, along the line U-T, say the ore is on the dip; the latter, observing the same formation, it is on the strike. The former say the Finn tunnel, north from the foot of the Condon winze, follows a streak of the vein; the latter, it is barren material. Likewise the former say the workings north of the line U-T are in vein lime and vein material; the latter, in barren country rock. In many places on the different levels in the northern workings, there the former see vein material, the latter, see nothing but limestone. Such are, in substance, some of the differences in the statements of the witnesses, whether of facts or conclusions from facts. Nor is it surprising that conflict exists. It is a usual feature in such a suit—of such ordinary occurrence, and so often of such grave character, that the advisability of trying a mining suit before a jury may be doubted. Nor can it be attributed wholly to partizan zeal or personal interest. The high character of the witnesses, in general, in this case forbids this. Science has not yet unfolded all of nature's intricacies, and in all probability never will to such an extent that the fallible human mind can fully grasp them, though indications may be revealed. To look at a mountain is one thing, but to look into the inner recesses of the earth, through surface indications, is another. Every geologist, every miner, knows that, in determining the contents and actual conditions of a mountain by surface indications, even with extensive workings, which, after all, constitute but slight explorations compared with the whole mass, such difficulties are necessarily and invariable encountered as to produce differences of opinion between persons looking at the same material—considering the same physical facts. Inductive reasoning has not attained such a high state of perfection as to lead all men, viewing the same parts, to the same conclusion as to the whole. This is especially true when the investigation of a portion of a thing is attended with great difficulties. In cases of stratified rocks, where the beds are

regular, it is comparatively easy to determine the location of a vein, its strike and dip; but where, as in this instance, the beds are broken, tilted, and fractured, and, in places fissures running in all directions, the investigation of one part may lead to very erroneous conclusions as to the formation and contents, in general, or as to the location and course of a particular section or ledge; a small part of its location and course only being definitely known. Every one who has ever attempted to trace, either by surface indications or underground workings, or both, a vein through an eruptive country, or, as here, through sedimentary beds, broken and tilted, with fractures running in every conceivable direction, where anticlines and synclines exist, and the regular dip of the formation in places is obliterated, knows that the investigation is not only laborious, of slow progress, and attended with innumerable difficulties, but is liable, in the end, to be attended even among the most candid, with antagonistic theories, erroneous conclusions, doubt, and uncertainty. This is strikingly illustrated, in this case, in the fact that for more than a quarter of a century the Mammoth mine was operated by experienced miners, vast amounts of ore extracted from the vein in the southerly end of lot 38, the mountain to the north perforated with expensive, but profitless drifts, along and through the dyke, and cross-cuts to the east and west, and yet it could not have occurred to the operators, from the indications and physical facts disclosed by the operations, during all those years, that the vein had, between the 300 and 400 levels, split and the major portion passed through the dyke on its dip to the west; for, so far as shown by the record, no attempt was ever made to follow that alleged western portion of the vein on the inclination, or to trace it in the direction of the ore bodies in dispute, or into the disputed territory, until after those ore bodies were struck in the Grand Central ground by the respondent in 1897, although the Mammoth shaft had been sunk hundreds of feet below those ore bodies; and even now, as we have seen from the review of the evidence, with drifts and cross-cuts,

on different levels, extended and driven, the surface of lot 38 dotted with open cuts and exposures, as appears from the diagrams and testimony, all for the purposes of this trial, not only the appellant's operators and miners, but its experts appear to be unable to trace or locate the hanging and foot walls of the vein, either at the surface or at depth. Under such circumstances, it need not be marveled, that the witnesses, looking at the same things and same characteristic features, did not see them alike, or draw the same conclusions from them.

Suppose, however, notwithstanding there is a conflict in the evidence, we assume, without deciding, that such conflict relates, as is insisted by the appellant, only to the opinions of witnesses as to what the physical facts show, and that the rule, invoked by the respondent, should not, under the circumstances, be enforced, the question then is, was the court justified, under the evidence, in holding that the vein departed, at the point designated in the finding, from lot 38 on a northwesterly course, and did not return to that claim north of that point? In determining this question it becomes important to consider the nature and principal characteristics of this vein, and, in connection therewith, some prominent geological features disclosed by the evidence. Before doing this, it will be well to notice that the appellant contends that the vein consists of a series of parallel fissures in limestone, the ore being mixed up with broken, shattered rock; that the vein is so constituted both at the surface and at depth; and that the limits of the vein are coextensive with the limits of the broken, crushed, seamed, and fissured limestone. Upon this theory it is insisted that, while the broken, stained, and shattered material carries little of the valuable metals on and near the surface, it is vein matter and evidence of vein, and that the court erred in charging the jury that the apex of a fissure vein is the highest point at which vein matter is found, and "by vein matter in this connection I mean rock or earth containing mineral in quantities appreciably greater than is found in the general mass of the mountain." Whether or not this instruction is erroneous we need not stop to

determine. This being a cause in equity, the verdict of the jury upon the controverted questions of fact submitted to it was but advisory to the court, and therefore error could not be predicated upon instructions given or refused. The judge had the undoubted right to disregard the verdict or special findings, or consider them in whole or in part, or determine for himself the special issues submitted, as he chose.

"It was therefore a proper exercise of authority for the judge in this case to examine the evidence in the case for himself and determine the questions at issue between the parties according to the weight of evidence, notwithstanding the proceedings taken with the jury and the verdict returned; and having, in exercise of that authority, made and filed his written decision, in which the facts found corresponded with the verdict of the jury, error cannot be predicated on his findings, if they are sustained by the evidence, notwithstanding the previous instructions to the jury; for, having the right to disregard the verdict, he had also the right to disregard the instructions to the jury that rendered the verdict. It is true that the decision of the court and the verdict of the jury were in harmony; but the decision of the court is the judgment of the court, and this judgment was warranted by the evidence or it was not. If it was not, a new trial should be granted. If it was, it cannot be reversed, except upon other grounds." (*Sweeter v. Dobbins,* 65 Cal. 529, 4 Pac. 540; *Schneider v. Brown,* 85 Cal. 205, 24 Pac. 579, 21 L. R. A. 33, 33 Am. St. Rep. 209.)

In determining the question before us, however, whether the finding of the court was warranted by the evidence, it is important to consider what constitutes a vein or lode. It will hardly be contended that, merely because rock is broken, crushed, shattered, and even fissured, it constitutes a vein within the meaning of the laws of Congress. All miners of any experience, as well as men of scientific research, know

that such occurences may be found in the most barren coun-
try. Something more,is necessary to dignify that kind of ma-
terial with the character of a vein or lode. The material,
whatever else may be its condition, must be metalliferous—
must contain some kind of mineral of value, so as to distin-
guish it from the country rock; and especially is this true
where there are no well-defined walls. This is so in the case
of a contact, as well as of a fissure. Where it is barren for
a considerable distance, barren in its continuity, it is deprived
of the character of a vein. But wherever a vein has at
any time existed, with continuity of ore which by some
subsequent convulsion or volcanic action may have been
interrupted, the character of the vein or deposit is not
changed. (*Stevens v. Williams,* 1 Mor. Min. Rep. 557.) Fis-
sure veins have many characteristics. They are the fillings
of fissures or openings of the country rock, of all kinds of
rock of all ages, contain different kinds of material, in some
respects corresponding with, in others differing from, the
country rock; the most common material being quartz. The
fissures have selvages and slickensides, and the gangue mater-
ial is generally easily distinguished from the country rock.
Fissure vein are simple or banded, according to structure as
to minerals. Some continue in the same direction; others are
irregular and change their courses. Some have a continuity
of ore, while others are barren in places, and still others are
faulted. The appellant, as we have seen from the testimony,
claims the vein in dispute is continuous in the same direc-
tion; the respondent, that it changes its course and is fault-
ed. The books tell us that vein-making fissures have been
formed, by contraction or drying, as in argillaceous stra-
tum, or on cooling from fusion, or from heat attending meta-
morphism; by subterranean movements, pre-eminently those
which have attended mountain making; by the disruptive or
expansive action of vapors resulting from volcanic action;
and by corroding vapors or by solutions from the deep,
which sometimes enlarge the fissure, especially where the
rock is limestone. (Dana, Manual of Geology.) Fissures
formed through volcanic action, and enlarged by corroding

solutions and vapors, are deep-seated, and frequently contain large cavities. That the vein in question was so formed by such action and solutions or vapors appears from the testimony, as we have already observed. It will be perceived that to define the word "vein," that represents a thing of so many and varied characteristics, is a matter attended with difficulty. Especially is this true if such definition, in view of the statutes which deal with mineral-bearing veins only, is to convey an accurate idea of the thing itself.

Mr. Justice Field, in the *Eureka Case,* 4 Sawy. 302, Fed. Cas. No. 4,548, said:

> "It is difficult to give any definition of the term as understood and used in the acts of Congress, which will not be subject to criticism. A fissure in the earth's crust, an opening in its rocks and strata made by some force of nature, in which the mineral is deposited, would seem to be essential to the definition of a lode, in the judgment of geologists. But to the practical miner, the fissure and its walls are only of importance as indicating the boundaries within which he may look for and reasonably expect to find the ore he seeks. A continuous body of mineralized rock, lying within any other well-defined boundaries on the earth's surface and under it, would equally constitute, in his eyes, a lode. We are of opinion, therefore, that the term as used in the acts of Congress is applicable to any zone or belt of mineralized rock lying within boundaries clearly separating it from the neighboring rock."

In *Iron Silver Min. Co. v. Cheesman,* 116 U. S. 529, 6 Sup. Ct. 481, 29 L. Ed. 712, the Supreme Court of the United States adopted a definition of vein given by Mr. Justice Hallett in the same case, as follows:

> "To determine whether a lode or vein exists, it is necessary to define those terms; and, as to that, it is enough to say that a lode or vein is a body of mineral, or mineral-bearing rock, within

defined boundaries in the general mass of the mountain. In this definition the elements are the body' of mineral or mineral-bearing rock and the boundaries. With either of these things well established, very slight evidence may be accepted as to the existence of the other. A body of mineral or mineral-bearing rock in the general mass of the mountain, so far as it may continue unbroken and without interruption, may be regarded as a lode, whatever the boundaries may be. In the existence of such body, and to the extent of it, boundaries are implied. On the other hand, with well-defined boundaries, very slight evidence of ore within such boundaries will prove the existence of a lode. Such boundaries constitute a fissure, and if in such fissure ore is found, although at considerable intervals and in small quantities, it is called a lode or vein."

So, in *United States v. Iron Silver Min. Co.,* 128 U. S. 673, 9 Sup. Ct. 195, 32 L. Ed. 571, Mr. Justice Field said:

"By 'veins or lodes,' as here used, are meant lines or aggregations of metal embedded in quartz or other rock in place. The terms are found together in the statutes, and both are intended to indicate the presence of mineral in rock." (*Cheesman v. Shreeve* [C. C.], 40 Fed. 787; *Hyman v. Wheeler* [C. C.], 29 Fed. 347; *Leadville Min. Co. v. Fitzgerald,* 4 Mor. Min. Rep. 380.)

In all these definitions, as will be noticed, the essential elements of a vein are mineral or mineral-bearing rock and boundaries, and no doubt that, when one of these elements is well established, "very slight evidence may be accepted as to the existence of the other." It would seem, therefore, that where one claims extralateral rights under the acts of Congress, because of a vein existing and apexing in his ground, but which has no well-defined boundaries, he, when his claim is controverted, must, in order to exercise such

rights, show a ledge or body of mineral or mineral-bearing rock of such value as will distinguish it from the country rock, or from the general mass of the mountain. The material must in texture and value be such as to show the existence of a vein, and the mere fact, as has been stated, or proof of the fact, that the rock is broken, shattered, and fissured, and mixed with calcareous substance, though it may show a conglomerate mass, does not establish, in the sense of the statutes, a vein. When, however, the walls or boundaries are well-defined, the vein differentiated from the adjacent country, and the kind of material mentioned constitutes the filling, evidence of slight value in mineral will, it seems, be sufficient.

It is insisted for the appellant, however, that "a lode, within the meaning of the statute, is whatever the minor can follow with a reasonable expectation of finding ore;" that, though he sees no ore, yet, if he sees gangue and vein matter, he discovers the lode; and that whatever material would be sufficient to render valid a location thereon would be sufficient evidence of apex to justify one in following therefrom downwards, beyond the side lines of the location, in the same kind of material, to and beneath the surface of his neighbor's property. We do not thus interpret the law. What may constitute a sufficient discovery to warrant a location of a claim may be wholly inadequate to justify the locator in claiming or exercising any rights reserved by the statutes. What constitutes a discovery that will validate a location is very a different thing from what constitutes an apex, to which attaches the statutory right to invade the possession of and appropriate the property which is presumed to belong to an adjoining owner. The question of a sufficient discovery of a vein, or of the validity of a notice of location, upon which the cases cited by the appellant on this point are authority, is substantially different from one relating to the continuity of a vein on its dip from the apex, and which tests the rights of the undisputed owner of the surface to what lies underneath and within his own boundaries. It is the object and policy of the law to encourage the prospector and miner in their ef-

forts to discover the hidden treasures of the mountains, and
therefore, as between conflicting lode claimants, the law is
liberally construed in favor of the senior location; but where
one claims what prima facie belongs to his neighbor, because
of an apex in the claimant's location, a more rigid rule of
construction against the claimant prevails, and, as we have
already observed, he has the burden to show, not merely that
the vein on its dip may include the ore bodies in the adjoin-
ing ground, but that in fact it does so include them.    Until
he establishes such fact beyond reasonable controversy, he has
no rights outside his side lines in another's ground.

> "In determining what constitutes such a discov-
> ery as will satisfy the law and form the basis of a
> valid mining location, we find, as in the case of the
> definition of the terms 'lode' or 'vein' that the ten-
> dency of the courts is toward marked liberality of
> construction where a question arises between two
> miners who have located claims upon the same lode
> or within the same surface boundaries, and toward
> strict rules of interpretation when the miner as-
> serts rights in property which either prima facie be-
> longs to some one else or is claimed under laws oth-
> er than those providing for the disposition of min-
> eral lands, in which latter case the relative value of
> the tract is a matter directly in issue.    The reason
> for this is obvious.    In the case where two miners
> assert rights based upon separate alleged discover-
> ies on the same vein, neither is hampered with pre-
> sumptions arising from a prior grant of the tract,
> to overcome which strict proof is required.    In ap-
> plying a liberal rule to one class of cases and a rigid
> rule to another, the courts justify their action upon
> the theory that the object of each section of the Re-
> vised Statutes, and the whole policy of the entire
> law should not be overlooked." (1 Lindley on Mines
> [2 Ed.], sec. 336.)

29 Utah—37

The Supreme Court of Montana, in *Fitzgerald v. Clark,* 17 Mont. 100, 42 Pac. 273, 30 L. R. A. 803, 52 Am. St. Rep. 665, observed:

> "When it is said that a location may be sustained by the discovery of mineral deposits of such value as to at least justify the exploration of the lode in the expectation of finding ore sufficiently valuable to work, it is a very different question from telling a jury that the geological fact of the continuity of the vein to a certain point may be determined by what a practical miner might do in looking for some hoped-for continuity." (*Migeon v. Mont. Cent. Ry. Co.,* 77 Fed. 249, 23 C. C. A. 156; *Bonner v. Meikle* [C. C.], 82 Fed. 697; *United States v. Iron Silver Min. Co.,* 128 U. S. 673, 9 Sup. Ct. 195, 32 L. Ed. 571.)

Reverting to the characteristic of a vein or lode, appearing from the definitions above quoted, that its filling must consist of a body of mineral or mineral-bearing rock, what value such material should contain is a matter not devoid of difficulty, and no standard of value applicable to all such cases has yet, and probably never will be, devised. It must necessarily depend upon the characteristics of the district or country in which the vein or lode, in any particular instance claimed to exist, is located, and upon the character, as to boundaries, of the vein itself. If the country rock, or the general mass of the mountain outside of the limits of the vein, is wholly barren, slight values of the vein material, as before stated, would seem to satisfy the law; but if, on the other hand, the rock of the district generally carries values, then undoubtedly the values in the vein material, where the boundaries of the vein are not well or not at all defined, either on the surface or at depth, should be in excess of those of the country rock, else there can be no line of demarkation, nor, where the rock is generally broken, shattered, and fissured, anything to separate it from the adjacent country. Values, therefore, of the filling of a vein, must be considered with

special reference to the district where the vein or lode is found. It is likewise as to a definition of a vein or lode. In *Migeon v. Montana Cent. Ry. Co.*, 77 Fed. 249, 23 C. C. A. 156, it was said:

> "The definition of a lode must always have special reference to the formation and peculiar characteristics of the particular district in which the lode or vein is found." (*Bonner v. Meikle*, supra.)

Now, weighing and considering the evidence, which we have already examined, in the light of the foregoing definitions, adopted and announced by the most eminent tribunal in this country, and bearing in mind the characteristics of a vein to which we have adverted, the conclusion seems inevitable that no vein that will satisfy the demands of the law has been shown to exist north of the north end of the Cunningham stope, or north of the Silveropolis south end line extended, within the limits of lot 38, which from its apex on its dip extends to and includes the ore bodies in question.

Looking again at the surface of lot 38, through the evidence, we see, it is true, outside the dykes, broken, shattered, and fractured rocks, seams filled with calcite, or calcareous matter, in places brecciated material, and stains of different oxides of iron and occasionally of manganese; but what we conceive to be a decided preponderance of the evidence shows that these same conditions of the rock and earth appear in the same manner and to about the same extent throughout the limestone area north of that end line, except in the vicinity of the line of stoping and of the dykes. The evidence respecting the surface, considered all together, conveys the idea that generally the portion of the country referred to, including lot 38 north of the Cunningham stope, presents substantially the same appearance, except in the vicinity of the dykes, the back fissure, and ore bodies, and that wherever the rock is exposed, by erosion or otherwise, its broken, fractured, and seamed condition is visible. So, as we have seen from the review of the evidence, the same similarity of appearances and conditions of rock and material exists beneath the

surface on the various levels in both mines. In fact, we feel warranted in the conclusion that it is established by the over-whelming weight of the evidence that the easterly portion of Condon tunnel; the northerly portion of the Finn tun-nel level, including both of its westerly branches; the Grand Central 200 level, from its easterly face back to station T; the northerly portion of the Mammoth tunnel level, including the three westerly or northwesterly branches and the Dago raises; the branch westerly from station 106 on the Mammoth 400, and the Grand Central 400 level from its easterly face back to the winze; the workings on the 500 level from about station 584 north; the northerly workings on the Mammoth 600 level, including the east and west cross-cut from station 643, and the new cross-cut running westerly from station 15 into Silveropolis ground; the northerly por-tion of the Mammoth 700 level, including the long connect-ing cross-cut, and the Grand Central 700 from its easterly face back to station 22; and the Tranter drift and northerly workings on the Mammoth 800 level—are all outside of any vein such as the law contemplates, but are in country rock, except instances where such workings run along or cross the dykes and are in dyke material. According to the decided preponderance of the evidence, therefore, even though what-ever conflict therein exists be regarded as relating to the opinion of witnesses merely, the section of country lying west of the west side line, or, rather, west of the east side line, of lot 38, and north of the ore bodies cut by the plane H-H, or lying along a plane drawn vertically down through the line U-T, or north of the plane E-E, and east of the stoping along and in the direction of the line T-S, is practically bar-ren of mineral, although the rock, in general, is much brok-en, shattered, and fractured, with fissures running in all di-rections. The same barren condition of that section of ground also appears from the assays of the samples taken from the surface and the workings at depth.

It is true, the appellant claims the open cuts and the work-ings at depth are substantially all in vein material; but, as we have seen, in the judgment of the appellant's witnesses,

broker., shattered, and fissured limestone, or crushed and brec-
ciated matter, no matter how barren, constitutes vein mater-
ial, although such matter and conditions exist, without any
defined boundaries, many hundreds of feet to the east and
west of lot 38, in fact throughout that limestone area, so far
as it was examined by witnesses, and with no more miner-
alization than is contained in the general mass of the moun-
tain or more than 1,000 feet to the east and west, or through
the limestone belt. Is it not difficult to perceive how such
material, in the absence of both a hanging and foot wall, can
be regarded as a vein? Are not the essential characteristics
of a vein or lode absolutely wanting? In the absence of the
very elements which constitute a vein, as defined by the high-
est court of our country, how can we hold a vein exists?
There appears to be no mineralization in excess of that con-
tained in the country rock; the existence of no body
of mineral or mineral-bearing rock in any opening or
fissure established. No witness, save Mr. Akers, at-
tempted to locate, the foot wall of the vein, and he,
as we have noticed, at but one place, about 20 feet
west of station 643 on the 600 level, in judgment
only; for his evidence is not direct or satisfactory as
to the fact. Several witnesses at a few points attempted to
fix the hanging wall; but in each instance the testimony re-
specting it seems to point to an arbitrary location, for the
fracturing, which they claim to be the limits of the vein,
extends far to the west of the places pointed to as the hang-
ing wall. We doubt if the most careful scrutiny of a scien-
tific expert on mines could, from the description of the ma-
terial in evidence, locate what, in the judgment of those wit-
nesses, is the hanging wall. It seems to exist in opinion only.
Nor does the fracturing stop at the Grand Central ore bod-
ies. It is shown in evidence to extend, at least as far west
as the Grand Central shaft, more than 1,000 feet beyond
where that wall was attempted to be located. No court would
be justified in holding that, in such a formation as this, the
limits of fracturing constitute the limits of the vein. Such
a holding would be alike unreasonable and impracticable. It

would convert practically all that whole limestone area into a vein—a vein thousands of feet wide, the like of which, we venture to say, no geologist or miner has ever known. Even if there be found an occasional vugg or fragment of ore, yet where it is disconnected from any ore body and so intermingled with and surrounded by country rock that it cannot be regarded as continuous, it does not mark the line of a vein or lode, within the meaning of the law. (*Bunker Hill & S. M. & C. Co. v. E. St. Ida. M. & D. Co.* [C. C.], 134 Fed. 268; *Cheesman v. Shreeve* [C. C.], 40 Fed. 787; *Iron Silver Min. Co. v. Cheesman,* 116 U. S. 529, 6 Sup. Ct. 481, 29 L. Ed. 712.)

Upon very careful scrunity of the 'evidence, we are of the opinion that the court did not err in rejecting the theory that the limits of fracturing constituted the limits of the vein, nor in holding that the vein existing in the south end of lot 38 did not continue in that lot north of the north end of the Cunningham stope. Where, then, and in what direction, does the vein proceed on its strike from that stope, and where are its boundaries or limits? That the Mammoth vein was formed by replacement—by replacing the limestone, molecule for molecule, with mineral through the thermal and chemical waters, or corroding vapors or solutions, ascending from the deep through the fissure or series of fissures constituting the lode—and that, where the ore appears, the fissure or opening was widened and large cavities created and filled with ore, through metasomatic action, appears manifest from the evidence. The acid and corrosive solution acting upon the limestone corroded it or dissolved it, and the limestone thus precipitated the ore by depositing it out of the solutions. Thus, evidently, the ore bodies were built up particle by particle by dissolving the limestone and precipitating the ore, or by replacing the limestone with ore. It appears in evidence that great masses of ore are found in which the original bedding planes can yet be traced, these planes not having been obliterated by the metasomatic change. These things are not denied by the witnesses for the appellant, but, on the contrary, its leading witness admits that

there are evidences of metasomatic change in the Mammoth vein, although he says he has heard or read of no mines in limestone where the process of replacement was so limited as in these mines. It also appears in evidence, as has been observed, that in running from an ore body into limestone anywhere barren rock will be encountered within a few inches or a few feet of the ore. In other words, the limit of the ore everywhere is practically barren rock or barren material. This clearly appears from the testimony of Col. Wall and of Mr. Loose. According to the decided weight of the evidence, the mineralization practically ceases everywhere within a short distance from the ore bodies. The vein and ore bodies, going northerly from the Mammoth shaft, rarely reach a width of 100 feet. This condition of things exists all along the fissure northerly through the great ore bodies to the Cunningham stope, thence through the ore bodies in the direction of the lines U-T and T-S. It is the same on each side of where the vein passes through the dyke, and the country in the vicinity of the dykes, where the vein penetrates them, is very much crushed and shattered. The direction of the ore channel and and ore bodies will readily be observed from the diagrams. It will be noticed that the ore channel, although irregular and changing its course at the Cunningham stop and at the Bradley-Consort line, is continuous clear through from the Mammoth shaft to north of the Butterfly stope, a distance of more than 2,000 feet, and more than 1,400 feet, as we have seen before, in the northwesterly direction from the Cunningham stope, and doubtless the course of a vein longitudinally, as it passes through the country, is its strike. That the vein has well-defined boundaries and strike from the south end line of lot 38 to the north end of that stope, a distance of about 700 feet, is not controverted; but from there on in the northwesterly direction, although the same conditions continue to exist, the appellant insists that the ore bodies are on the dip, and not on the strike, of the vein. But why not on the strike? What facts are there established by the evidence that show the ore bodies on the dip and not on the strike? We must confess our inability, upon most careful scrutiny of the mass of evi-

dence, to find anything to warrant us in sustaining the contention of the appellant.  The character of the fissure, the processes that evidently controlled in the deposition of the ore, the characteristics of the vein where it is not in dispute and those where it is in dispute, including the continuity of the ore in the line of the channel, the barrenness of the rock as you recede from the ore, the dip of the vein and of the back fissure, yet to be adverted to, the similarity of the earth and rock throughout the limestone area outside of the ore bodies and dykes, some prominent geological features yet to be noticed, all militate against the contention and point unerringly, it seems, to the line marked by the ore channel as the location and strike of the vein, and to the limits of the deposition of ore as the limits of the vein.

Reverting to the geological features, just mentioned and before  referred to, we will first notice the dip of the vein and back fissure, and here the appellant in its contention encounters a serious obstacle; for in vain will the record be searched for a degree of inclination that would carry a vein from lot 38 to the ore bodies in dispute.  The vein and ore bodies, wherever explored, occupy almost a vertical position. As we have shown  by a review of the evidence, at the Mammoth shaft the vein and ore go to the deep so nearly vertical that on the 1,900 level, a distance of 1,800 feet, the westing is but 100 feet, and the dip over 86° from the horizontal. The dip of the back fissure is shown to be about the same from the Finn tunnel to the 800 level, a distance of 688 feet; the Finn tunnel being 92 feet and the 800 level 135, west of the west side line of lot 38, making a westing of but 43 feet and a dip if 86½°.  So we  have seen that,  on the Grand Central side, from top of the winze on the 400 down to the 1,000 level, the dip is 82° from the horizontal, and that along the line U-T, where the ore bodies in dispute occur, the dip is 75° to 80° degrees from the horizontal.  Now, considering the dip of the vein, as thus shown in both mines, in connection with the long distance, apparent from the surface maps, intervening between the west side line of lot 38 and the ore bodies and vein on the Grand Central side, is it not

clear, without further demonstration, that no dip is shown that could carry a vein from lot 38 to the controverted ore bodies and vein in the Grand Central mine? Such certainly seems to be the fact under the proof. But Mr. Earnshaw, one of the appellant's witnesses, it is claimed, followed the vein from the Condon tunnel, through the Condon winze and other openings, down to the 800 level. While it no doubt is true that he went down through the various openings, as he says, consisting of winzes, raises, and drifts, to that level, still that does not show a tracing of a vein apexing in lot 38 on its dip to the ore in controversy. The Condon winze and other openings to which he refers, including the Betsy stope, as has already been shown, are in or connected with the back fissure, which extends north from the Cunningham stope; and the ore bodies in controversy manifestly are not in that fissure, and consequently such tracing shows no continuity of a vein, on its dip, that includes them.

The back fissure is a geological feature of much importance. Mr. Akers, as previously shown, states that the main vein forks, on the 400 level, north of the south end line of the Golden King claim, and the easterly portion continues northerly on the east side of the dyke. If this be true, then this fork must constitute the back fissure, which appears to be feathering out north of the Betsy stope near the 1,100-foot line. Through this fissure the Betsy stope and the various openings mentioned are connected with the main vein at or near the Cunningham stope, and doubtless form a part of it. It is clear, from the testimony and maps or diagrams, that practically all the ore, north of the Silveropolis south end line extended, which has been referred to in evidence, was either in or connected with the back fissure, or was in the broken and crushed country in the vicinity of the junction of the dykes, and where the fork, which Mr. Akers says diverges to the northwest, passes through the dykes. The Betsy stope is admittedly in the back fissure, north of that end line, on the east side of the Finn dyke, and the great Klondyke stope is immediately west and to the south of the Betsy stope in the crushed country referred to. That the various ore deposits, including those stopes found immediately

to the north and south of the main ore channel, were made by the mineral solutions rising through the main fissure, we entertain little doubt. This position is supported by the fact that, as one proceeds north or south from the ore channel in that vicinity a comparatively short distance, the ore depositions cease. Nowhere in that ground, so far as shown, has ore in considerable quantities been found remote from and disconnected with the main ore channel. So in the same way may be accounted for and explained the splitting of the vein, and the westerly branch passing through the Finn dyke, which the appellant claims occurred between the 300 and 400 levels, and about the 80-foot level on the plane H-H. Whatever appearances of ore may exist there, they were doubtless caused by the dynamic disturbance in the formation of the fissure, the breaking through the dyke, and the ore depositing solutions or vapors; for nowhere else along the dyke, so far as appears from the evidence, has there been discovered a similar occurrence. It will be observed that the only place where ore in any considerable quantity and unmistakable vein matter are found in connection with the dykes is in the immediate vicinity of the ore channel where it passes through them. Yet, if the appellant's theory that the vein passes through the Finn dyke on its dip were well founded, we would expect to find evidences of it passing through it at other points along its strike. It seems perfectly intelligible that, when the mineral-bearing solutions ascended from the deep and circulated through the main fissure or series of fissures, they were, by pressure or other of nature's processes, forced through the crushed and shattered rock and loose brecciated material, and that by metasomatic action of the solutions the mineral was deposited as far as the rock or material was thus physically prepared for the passage of those solutions. The evidence shows that the rock, at the junction of the dykes and where the vein passes through them, was so prepared, and this accounts for the strong mineralization in that vicinity, and for the large ore bodies, in places, like those of the Betsy and Klondyke stopes, leading out from the main fissure or ore channel.

The appellant contends, however, that the vein from the

Cunningham stope to the Bradley-Consort line cannot be on its strike, because along the line U-T' the vein is not coursing on a horizontal plane, but is descending at an angle of about 70° from the horizontal. Answering this contention, the respondent insists that the downward course of the ore from the Cunningham stope, in the direction of the line U-T, is due to faults, along the dykes or brakes, by which the country, on the hanging wall side of the Finn dyke, has been successively dropped and the vein thereby faulted. This leads to a consideration of one of the most interesting and significant geological features disclosed by the evidence, although frequent reference thereto has already been made throughout the discussion herein. We concur with witnesses in the criticism that the word "dyke," applied either to the Finn or Coates occurrence, is not an appropriate term. It is an inappropriate name, applied to what might with propriety be termed a faulting fracture. Those occurrences are not intrusions of igneous rocks or matter between sedimentary beds, characteristic of dykes; but, according to the testimony, the fractures are filled with minute angular fragments of sedimentary bed rock—limestone and clay—brecciated material, in places, recemented with calcite. The term "dyke," however, having been employed in the record and briefs, has been and will be retained herein for convenience in referring to either of the fractures.

The Finn dyke has a course N. about 15° to 20° E., and the appellant claims the foot wall of the dyke is coincident with the hanging wall of the vein in controversy; but, as we have seen, no vein has been established along the dyke, except the back fissure, which seems to fade out near the 1,100-foot line. The Coates dyke courses nearly north and south with a dip almost vertical—a little inclined to the west. The Finn has a dip to the west of 80° to 85° from the horizontal, and is irregular in width, ranging from 15 to 40 or 50 feet, and where it unites with the Coates dyke the lime breccia is probably 120 to 125 feet wide. On the different levels the two dykes are close together. Their junction is practically

vertically under the south end line of the Silveropolis claim, although it sometimes varies to 100 feet to the south. At or near this junction, practically on the line T-U, the vein and ore, as we have seen, pass, the respondent claims on the strike, the appellant on the dip, through the dykes. The Finn dyke marks the boundary between two great masses or beds of fissured lime rocks—vast geological blocks. The indications disclosed by the evidence are that it has grown wider with successive movements, through succeeding ages, and that it is confined to the limestone. There appears to be nothing to indicate that it extends deeper into the earth than the limestone, if so deep; there being no indication of disruption or expansive action of vapors or of corroding solutions resulting from volcanic action, except in the locality where the vein passes through it. In places the particles composing the filling of the fracture are recemented, and in others the material is crushed and loose, especially so at and in the vicinity of the junction, and where the vein penetrates the breaks. Except where the ore channel passes through them, the dykes are not mineralized. That they were originally formed premineral, and that there has been a faulting of the country along the Finn break, witnesses on both sides appear to agree. They also agree that there were subsequent movements which resulted in further crushing and grinding up the material of the dyke, and in either raising the foot wall country, along the course of the break, or dropping the hanging wall country. There is a disagreement among the witnesses, however, as to whether the faulting occurred anterior or subsequent to the formation of the vein and ore bodies. In the opinions of the expert witnesses for the respondent the faulting occurred subsequent to the deposition of the mineral, and resulted in a dislocation and dropping of the ore bodies, on the west side of the Finn dyke, to a position down anywhere to 400 feet below that occupied before the faulting took place. While in the judgment of the witnesses for the defense the faulting was premineral, the appellant's leading experts admit, not only that subsequent to the formation of the dyke movements oc-

curred along the break resulting in faults, but Mr. Akers says
he would expect the faulting to be considerably over 50 and
possibly several hundred feet; but, whether the throw was
up or down, in his opinion, could not be determined. There
are indications disclosed by the testimony, however, that
strongly tend to show that the throw, or possibly a succession
of throws, were down and not up. Such are the indications
near the southerly end of the drift, running south along the
dyke on the 400 level, at station 401i, where Mr. Tyler says
ore, slight in quantity, was found in broken and shattered
material, and had the appearance of having been dragged
down from the ore bodies above. Dr. Talmage says low-grade
ore occurred at that station on the surface of fractured pieces
of limestone, and that there is evidence of movement pro-
ducing typical slickensides. Similar conditions appear on
the 500 level between stations 622 and 622b, and on the 700
level, where Mr. Tyler says the ore had not gotten entirely
through the dyke, was in a broken condition, and indicated
that it was mixed up with the dyke material, showing more
or less translation. There is also testimony showing that,
where the vein went through the dyke, the ore was crushed,
loose, oxidized, and rarely recemented. Evidently the dyke
grew wider, and its material became more crushed and pow-
dered, with each successive movement of the mountain masses
along the original line of fracture, and the conditions shown
by the evidence to exist fairly indicate, not only that fault-
ing occurred along the line of break since the deposition of
mineral, but that the hanging wall side, including the ore
bodies west of the dyke, was successively dropped to a great-
er or less extent, thereby changing the relative elevations of
the ore bodies existing east and west of the dykes. The dif-
ference in the elevations of the ore bodies would likewise be
largely accounted for if the foot wall country was raised, and
the hanging wall country not depressed. The importance of
this most significant geological feature in the consideration of
these vexed questions is thus apparent; for, if the difference
in the elevation of the ore bodies be accounted for by a de-
pression of the hanging wall or raising of the foot wall coun-

try, and we think the conclusion that one or the other of these throws occurred is but a logical and reasonable deduction from the indications in evidence, then it is too clear for argument that no dip of a vein has been shown which could possibly extend from an apex in Mammoth ground, north of the Silveropolis south end line extended, and intercept the ore bodies in dispute.

The position that faulting occurred after the deposition of ore, and that the vein was faulted, obscured, practically lost, by the movements along the dyke, is also in harmony with the conduct of the appellant during all the years of operation in the mine; for while, many years ago, the Cunningham stope was worked down to the 300 and the Betsy down to the 500 level, both stopes lying immediately east of the Finn break, the great Klondyke stope, on the 400 level, lying immediately west of the Betsy stope but a little farther south, in the crushed material of the breaks, was not disturbed until a comparatively short time before the commencement of this litigation. It is true, several of appellant's witnesses say there is continuous ore from the Betsy and Cunningham stopes to the Klondyke, and that the latter stope was not worked at the time of operations in the former stopes because the ground was considered dangerous; but is that the real reason why the operations were not extended to that vast ore body? Was not the ground, when that ore body was in fact discovered and the ore extracted, just as dangerous as during all the years from the time of the operations in the Cunningham and Betsy stopes? Is it not a reasonable inference, from the circumstances, that the faulting of the country along the Finn dyke and the consequent dislocation of the vein, had so obscured the ore that it never, during that long period of time from the operations in the other stopes until after the discovery of ore to the west by the respondent, occurred to the operators of the Mammoth mine or to its experienced miners that ore existed west of the dyke? It does seem unreasonable that an intelligent management would permit this vast deposit of ore to remain unexplored, untouched, for so many years, the very time during which the shaft was being

pushed to the depths far below, and the mountain masses, on various levels, punctured with drifts and cross-cuts in search for ore, if it had known or believed that ore existed west of the dyke. We are impelled to the conclusion that, with all the developments, the Mammoth operators entertained no thought that ore existed in that vicinity until after the discoveries made by the respondent within its territory. Nor is it shown that before such discovery it ever occurred to the management of the appellant, or to any of its agents, that an apex and vein existed in lot 38, north of the Cunningham stope or of the Silveropolis south end line extended, which, or any part of which, on its dip, passed through the dyke and continued down in ore west of the break.

To further show the improbability of the existence of such a vein, take the circumstance that the two lines, the line of apex, claimed by the appellant to continue parallel with the side lines of lot 38, or N. about 18° E., and the line of stoping, from the Silveropolis south end line extended, running N. 10° to 15° W., which, proceeding north, are constantly diverging; could it be claimed, with any degree of plausibility, that, after a point had been reached where the divergence had resulted in a distance of a mile or more between the lines, that a vein extending from that line of apex, on its dip, yet intercepted any ore that might exist, at such northern point, on the Grand Central 400, or 500, or lower levels extended? Surely there is not, in this voluminous record, even in the most extravagant statements of witnesses as to what constitutes a vein, any testimony showing a dip of any vein, or even of a bedding plane, which would make such a thing possible. Outside of this circumstance and the fact that all the prominent geological features, as we have seen, point with entire unanimity to the location of the Mammoth vein, on its strike, as being practically as represented by the stoping along the lines W-U, U-T, and T-S, and indicating that the vein passed through the dykes on its strike and not on its dip, there is yet another circumstance tending to show that such is the location and strike of the vein; and that is that on the

Mammoth side the production of ore has been nearly all from the vein south of the north end of the Betsy stope, having yielded in dividends more than $1,600,000 and for expenses about four-fifths of that sum, while on the Grand Central side the ores marketed amounted to more than $1,800,000 and those developed at the time of this trial and yet remaining in the mine to $600,000, showing by comparison that the vein retains its great producing character throughout its northerly and northwesterly course for a distance of nearly half a mile. Thus, upon careful review and extended discussion of the testimony relating to the underground workings and explorations, and upon deliberate consideration of the main geological features disclosed by the evidence, it seems clear that this great ore channel was formed by the mineral solutions from the deep coursing through a fissure or series of fissures, deflected from a northerly course at the Cunningham stope to a northwesterly course, and then again, near the Bradley-Consort line, to a more northerly course; that the channel and deposition of ore along its entire length resulted from the same causes and the same processes of nature; that the vein passed through the dykes on its strike and was faulted; and that the ore bodies in controversy are on its strike, and not on its dip, and belong to the owners of the Silveropolis and Consort mining claims. It follows inevitably that the findings of the court were but proper deductions from the proof, and, being sustained by the great weight of the evidence respecting both the surface and underground workings, this judgment must be affirmed, unless there was error in the refusal to permit the filing of the proposed amendment to the counterclaim, and the proposed original counterclaim, in each of which it was alleged that the vein departed from lot 38 as found by the court, but that it passed into and continued at its apex and on its strike in the Golden King and Bradley mining claims.

In passing to this branch of the case, it may be observed that the offer to amend the pleadings was occasioned by the action of the trial judge in filing a written opinion in the cause, aside from the findings, wherein, among other things,

he said: "My conclusion is that there are two veins in the Mammoth ground, one running from the shaft out north, and extending as far as the 1,700-foot line at least, and the other to the east. North of the extended south end line of the Silveropolis these two lodes come so close together that the ores from one have mingled with the ore from the other and destroyed the line of demarkation between them above the 80-foot level, so that the top of the back vein, apexing in the Bradley and Golden King, as is practically conceded, is the top of the front vein. But the front vein, as I have already stated, extends no farther north than the station marked 427 on the map of the 400-foot level." It would seem almost needless to say that, if this conclusion of the judge and some of the views expressed in his opinion were sustained by the evidence, his refusal to permit the amendment to be filed would unquestionably have been a gross abuse of discretion and reversible error; for, with a judgment in this suit in favor of the respondent, it would be idle to say, as was said in his opinion, that "in a proper proceeding the defendant should be decreed to be the owner of the ore bodies in dispute under the Silveropolis and Consort mining claims." This suit was itself "a proper proceeding" in which to determine and adjust the rights of the respective parties to those ore bodies, and a final judgment herein would undoubtedly be a bar to another suit between the same parties involving the same subject-matter. Can it be doubted that the affirmance of this judgment will bar another action involving the same controversy between these parties? Certainly this decision will become the law of the case, and will prevent further litigation as to any matter adjudicated herein. If, however, there were any evidence to support or justify the expressions of the judge—evidence to the effect that there were two veins, one of which apexed in the Golden King and Bradley claims, and on its dip included the ore bodies in dispute—then the amendment should have been allowed, not because of his opinion, but because of variance between the pleadings and the proof. But, as may be seen from the review and discussion of the evidence on the other branch of the case, there is

29 Utah—38

no proof whatever of such a state of things. Nor did the appellant at any time, during either one of the long trials, claim the existence of such a vein in those claims; nor did the skill of the men of science or of the experienced miners who testified, after critical examination of the 400 and of the various levels, detect a vein of that character. Under the proof, a vein apexing in the Golden King and Bradley claims and embracing the ore bodies in dispute can only exist in imagination, and the claim of the judge that it did in fact exist was but the result of an erroneous and mistaken view of the underground formations—of the geological facts in evidence. His written opinion, however, is not properly a part of the record, and affords no evidence that the recitals therein contained are true, or warranted by the proof. A trial judge may in any case give a written opinion or not, as he chooses; but this court is not bound by any reasons he may assign for his action or his judgment. Nor is his act in delivering such an opinion one upon which error can be predicated, although counsel may cite the document in argument. Nor can such opinion qualify or limit the findings of fact or decision. (*White v. Merrill,* 82 Cal. 14, 22 Pac. 1129; *In re Kingsley,* 93 Cal. 576, 29 Pac. 244; *Pearson v. G. N. Ry.* [Minn.], 95 N. W. 1113.)

Nor can the opinion thus filed herein be made the sole basis for amendment of the pleadings, where, as here, there is no variance between the pleadings and proof, and no offer of further proof under the proposed amendment. That there was no variance is clear, because the contention on each side was fairly within the scope of the pleadings, and all the evidence was introduced in support of one or the other of these contentions, and corresponds with the allegations in the pleadings, and because the facts in evidence show no apex or vein in the Golden King and Bradley such as is claimed by the judge to exist. Not only was there no offer or further proof, but counsel for appellant in their brief insist there was no further evidence to present, that the "evidence as to the physical facts on both sides was complete," and that "every level, every drift, every opening, every ore occurrence, had been

gone into in the greatest detail." They also say: "It appears from the record that the trial occupied as much as 70 days; that the sole question was as to where the apex of the vein was, and that all the evidence as to that question was offered, and that the investigation was full and complete; and the plaintiff was informed by defendant, before any evidence was offered, that if the proof should be that the apex was in the Jenkins, the Golden King, and the Bradley, the defendant would ask the court for leave to amend the complaint to make it conform to the proofs. It is apparent from all the evidence that the defendant on the trial inquired and investigated as fully and as thoroughly, by all legitimate means, where the apex of the vein in dispute was, as it would have done had the apex of the vein been alleged in defendant's counterclaim to be in the Golden King and Bradley claims; and it cannot be urged, in view of the evidence, that the plaintiff should have been surprised by the amendment, had leave to file it been granted." It is thus apparent that the proposed amendment and original counterclaim were not offered for the purpose of introducing further proof, nor to conform to the proof as it was understood to be by the parties but for the manifest purpose of having the pleadings conform to the opinion of the judge, regardless of what the proof in fact showed; and this, after the court had rendered its decision. If, under the circumstances, the court had permitted the filing of the proffered amendment and original counterclaim, its action would have been wholly unwarranted and a palpable abuse of discretion. If any one could know whether there was a vein in the Golden King and Bradley, extending north to station 427 of the 400 level, the defendant, after 30 years of operations and the large amount of work done preparatory for those protracted trials, ought surely to have been aware of it, and framed its pleadings accordingly. It could not take its stand upon an apex in lot 38, and, having trusted to fortune in that position, after trial and judgment, change to new ground, at the mere suggestion of a discovery of a vein by the trial judge, with no evidence to warrant the suggestion, no variance between the proof and pleadings, and

no offer of further proof, under the proposed amendment and new pleadings, seek a recovery upon such change of base. We can perceive neither equity nor justice in such a proceeding, under such circumstances, where years of time have already been consumed in the litigation, and where the battle has already been fought twice over, necessarily at enormous expense to the litigants, with the ability of eminent counsel and of skilled and learned witnesses, and has resulted at the end of each trial in practically the same judgment. As to the formations and indications upon the surface and on the various' levels, including the 400 level, as to the physical facts in evidence, the appellant had no more knowledge after than before the suggestion of the judge was made; and the formations, where this vein was claimed to be, all the prominent geological facts revealed by the evidence, the inferences drawn therefrom by the learned scientists and experts, and the long years of operations without discovery of such vein, render that opinion not only vulnerable, but show that it was not founded in fact, and, as we have seen, it cannot become the basis of amendment.

If such amendments, under such circumstances, were sanctioned, the ingenuity of counsel would not fail in pointing out, upon each successive defeat, a new avenue leading to another experiment, until the bankruptcy of the litigants would finally end the controversy. In *Warner v. Godfrey,* 186 U. S. 365, 22 Sup. Ct. 852, 46 L. Ed. 1203, the complainant filed his bill in equity to set aside a conveyance on the ground of actual fraud, and, being defeated, obtained leave to amend his bill, claiming the same relief, but upon the ground of constructive fraud. The trial court found that the charges of actual fraud were unfounded, and in this the appellate court of the District of Columbia concurred, but held that ' 'from another point of veiw, made clear by the testimony, though it may not be specifically presented by the pleadings," acts constituting "legal or constructive fraud," the plaintiff was entitled to prevail, reversed the decree dismissing the bill, and directed the lower court to permit an amendment. The bill was amended accordingly, and a decree entered in

favor of the plaintiff. Then on appeal to the Court of Appeals this decree was affirmed, and thereafter an appeal taken to the Supreme Court of the United States. That court held it error to permit the amendment, and, speaking through Mr. Justice White, said:

"It would be highly inequitable to permit a litigant to press with the greatest pertinacity for years unfounded demands for specific and general relief, however much confidence he may have had in such charges, necessitating large expenditures by the defendants to make a proper defense thereto, and then, after the submission of a cause, when the grounds of relief actually asserted were found to be wholly without merit, to allow averments to be made by way of amendment, constituting a new and substantive ground of relief." (1 Ency. Pl. & Pr. 584-586; *Gubbins v. Laughtenschlager* [C. C.], 75 Fed. 615; *Metropolitan Nat. Bank v. St. L. Dispatch Co.* [C. C.], 38 Fed. 57; *Marshall v. Golden Fleece M. Co.,* 16 Nev. 156, 180; *Page v. Williams,* 54 Cal. 562; *Richard v. Hupp* [Cal.], 37 Pac. 910; *Chicago, etc., Ry. Co. v. Third Nat. Bank,* 134 U. S. 276, 10 Sup. Ct. 550, 33 L. Ed. 900; *Shawyer v. Chamberlain,* 113 Iowa 742, 84 N. W. 661, 86 Am. St. Rep. 411.)

This suggestion of the trial judge, that there was a vein apexing in the Golden King and Bradley that embraced the disputed ore bodies, was a new theory in the case. So far as the record shows, during all the years the mine had been operated, such a vein had remained undiscovered. Nor had such a theory ever suggested itself to any of the eminent counsel or experts during either of the trials. The judge himself says that the conclusions which he has "deduced from the testimony differ widely from the views of both parties to the cause." He asserts that this vein exists and terminates in its course northward at station 427 of the 400 level, and that the ore bodies underlying the Silveropolis and Consort mining

claims south of the plane drawn through station 427, parallel to the Silveropolis south end line, are within such vein. Now, if that plane be extended westerly across those claims, it will cut an ore body or ore channel which, on the 700 and 800 levels, as has before been shown, is continuous for more than 1,300 feet, and then, if this vein terminates at station 427, to what vein, it may be asked, are we to refer the portion of that ore channel which is north of where it is cut by that plane? To what vein does the great Butterfly stope belong? The answer is plain. It is simply an unfounded, impossible theory, under the evidence, and furnishes no excuse for an amendment to the pleadings. The ore lying north of this imaginary plane and the ore lying south thereof all is in the same vein, and that vein extends from the south end of lot 38, on its strike, northerly and northwesterly along the line of ore bodies to and beyond the Butterfly stope. This seems to be the only rational theory, and the fact is established by the evidence beyond reasonable controversy, and is in harmony with the conduct of the appellant for more than a quarter of a century; for if, after operations have been conducted by it and its predecessors for more than 3 years, and after all the preparations for these protracted trials, the appellant is yet so uncertain as to where the apex of the vein, through which it claims the ore bodies in dispute, is that at the mere suggestion of the trial judge, without proof to warrant the suggestion, it is willing to abandon its former position, that the apex is in lot 38, and change it to the Golden King and Bradley, showing that it is yet unable to say where, in fact, the apex is, then surely its theory would form an unsafe basis upon which to found a judgment. Upon careful examination of this subject, we entertain no doubt that the proffered amendment was made, as the record discloses, not to conform to the proof, but, as we have said, to conform to the views expressed by the judge in his written opinion; and the court, therefore, under the facts in evidence, properly refused to permit it to be filed. It is a wholesome rule that one shall not be permitted to litigate his case by piecemeal, and one necessary to the proper administration of justice. If a litigant occasionally suffers through

its enforcement in a proper case, his misfortune must be attributed to his own want of foresight or lack of diligence. A court cannot set aside the well-established principles of the law, even where hardship may result from their application. *A fortiori*, will it refrain from doing so where the litigant receives apparently no injury. Such seems to be the case at bar. The appellant, having founded its claim to the ore bodies in its neighbor's ground upon reserved or extralateral rights has received no injury by its failure to establish a vein in its own ground which would warrant a recovery, and therefore cannot complain of the judgment against it; for it still owns all of its possessions. By this decree the appellant has been deprived of none of its property, although, if it had been successful, it would have acquired an immense fortune in its neighbor's land.

Not unmindful of the grave responsibility that attaches to the final decision of a case of such magnitude and importance, we have examined with commensurate caution the voluminous mass of evidence, in extended and deliberate discussion have announced our views upon the various questions involved, and have come to the inevitable conclusion that the appellant has shown no right of recovery under its counterclaim and no right to amend its pleadings.

The judgment must therefore be affirmed. It is affirmed, with costs.

McCARTY and STRAUP, JJ., concur.